[No. S046944. Aug. 28, 1997.]

THELMA L. RUTHERFORD et al., Plaintiffs and Respondents, v. OWENS-ILLINOIS, INC., Defendant and Appellant.

## COUNSEL

Morgenstein & Jubelirer, Eliot S. Jubelirer, Lee Ann Huntington and Bruce A. Wagman for Defendant and Appellant.

Brobeck, Phleger & Harrison, Thomas M. Peterson and Marilyn Fisher as Amici Curiae on behalf of Defendant and Appellant.

John C. Robinson and Bryce C. Anderson for Plaintiffs and Respondents.

**OPINION**

**BAXTER, J.—**

### I. *Introduction.*

In this consolidated action for asbestos-related personal injuries and wrongful death brought and tried in Solano County, defendant Owens-Illinois, Inc. (Owens-Illinois) contends the trial court erred in instructing the liability phase jury pursuant to Solano County Complex Asbestos Litigation General Order No. 21.00. This instruction shifts the burden of proof to defendants in asbestos cases tried on a products liability theory to prove that their products were *not* a legal cause of the plaintiff's injuries, provided the plaintiff first establishes certain predicate facts, chief among them that the defendant manufactured or sold defective asbestos-containing products to which plaintiff was exposed, and that plaintiff's exposure to asbestos fibers generally was a legal cause of plaintiff's injury. The Court of Appeal concluded the trial court erred in giving the burden-shifting instruction.

The Court of Appeal further held that the judgment in this case must be reversed because the trial court erred in refusing to permit Owens-Illinois to present a "tobacco company defense." The Court of Appeal's judgment in this regard was error requiring reversal under our recent holding in *Richards v. Owens-Illinois, Inc.* (1997) 14 Cal.4th 985, 988-989 [60 Cal.Rptr.2d 103, 928 P.2d 1181], a case consolidated and tried with the instant action and three others. However, because the Court of Appeal alternatively determined the trial court erred in giving the burden-shifting instruction, and because plaintiffs here additionally sought review of that aspect of the Court of Appeal's judgment, we must also in this case review the Court of Appeal's holding that it was error to give the burden-shifting instruction.

We conclude the Court of Appeal correctly determined that the burden-shifting instruction should not have been given in this case. For reasons to be explained, we hold that in cases of asbestos-related cancer, a jury instruction shifting the burden of proof to asbestos defendants on the element of causation is generally unnecessary and incorrect under settled statewide principles of tort law. Proof of causation in such cases will always present inherent practical difficulties, given the long latency period of asbestos-related disease, and the occupational settings that commonly exposed the worker to multiple forms and brands of asbestos products with varying degrees of toxicity. In general, however, no insuperable barriers prevent an asbestos-related cancer plaintiff from demonstrating that exposure to the defendant's asbestos products was, in reasonable medical probability, a

substantial factor in causing or contributing to his risk of developing cancer. We conclude that plaintiffs are required to prove no more than this. In particular, they need *not* prove with medical exactitude that fibers from a particular defendant's asbestos-containing products were those, or among those, that actually began the cellular process of malignancy. Instruction on the limits of the plaintiff's burden of proof of causation, together with the standardized instructions defining cause-in-fact causation under the substantial factor test (BAJI No. 3.76) and the doctrine of concurrent proximate legal causation (BAJI No. 3.77), will adequately apprise the jury of the elements required to establish causation. No burden-shifting instruction is necessary on the matter of proof of causation, and in the absence of such necessity, there is no justification or basis for shifting part of the plaintiff's burden of proof to the defendant to prove that it was not a legal cause of plaintiff's asbestos-related disease or injuries. (See *Summers* v. *Tice* (1948) 33 Cal.2d 80, 86 [199 P.2d 1, 5 A.L.R.2d 91] (*Summers*) [burden shift justified because without it all tortfeasors might escape liability and the injured plaintiff be left "remediless."].) However, as will be explained, the giving of the burden-shifting instruction in this case was harmless.

Ultimately, the sufficiency of the evidence of causation will depend on the factual circumstances of each case. Although the plaintiff must, in accordance with traditional tort principles, demonstrate to a reasonable medical probability that a product or products supplied by the defendant, to which he became exposed, were a substantial factor in causing his disease or risk of injuries, he is free to further establish that his particular asbestos disease is cumulative in nature, with many separate exposures each having constituted a "substantial factor" (BAJI No. 3.76) that contributed to his risk of injury. And although a defendant cannot escape *liability* simply because it cannot be determined with medical exactitude the precise contribution that exposure to fibers from defendant's products made to plaintiff's ultimate contraction of asbestos-related disease, all joint tortfeasors found liable as named defendants will remain entitled to limit *damages* ultimately assessed against them in accordance with established comparative fault and apportionment principles.

## II. *Factual and Procedural Background.*

Charles Rutherford (Rutherford) was in the Air Force from 1935 to 1940, after which he became an apprentice sheet metal worker at the Mare Island Naval Shipyard (Mare Island). He worked in the sheet metal shop for several years, and then became an engineering technician working with ventilation before retiring from Mare Island after 40 years. At the time of his death in April 1988, he had been married to Thelma L. Rutherford for 45 years, and they had 2 children.

In January 1988, three months before his death, Rutherford filed an asbestos-related personal injury action in Solano County Superior Court naming as defendants nineteen manufacturers and/or distributors of asbestos products, including the sole defendant in this appeal, Owens-Illinois. The original complaint alleged Rutherford had contracted lung cancer as a result of his exposure to defendants' asbestos products while on the job at Mare Island, and alleged causes of action for products liability, negligent and intentional infliction of emotional distress, and loss of consortium. After Rutherford died of lung cancer in April 1988, the complaint was amended to allege a wrongful death action brought by his wife, Thelma L. Rutherford, and their daughter, Cheryl Rutherford Thomas (hereafter plaintiffs).

Plaintiffs' case was consolidated for trial with four other actions presenting the similar claims of various other plaintiffs, including those of Harvey Richards (Solano County Super. Ct. No. V21705). In the appeal taken by defendant Owens-Illinois from the judgment of damages recovered by Richards, we recently held that the immunity accorded by Civil Code section 1714.45 to suppliers of certain unhealthy consumer products such as tobacco represents a legislative judgment that, to the extent of the immunity afforded, such companies have no "fault" or responsibility, in the legal sense, for harm caused by their products, and that such companies are therefore not "tortfeasors" to which comparative fault can be assigned for purposes of Proposition 51.[1] Consequently, we reversed the judgment of the Court of Appeal insofar as it concluded the trial court prejudicially erred in not allowing Owens-Illinois to present a "tobacco company defense." (*Richards v. Owens-Illinois, Inc., supra*, 14 Cal.4th 985, 988-989 (*Richards*).)

Under procedures adopted by the Solano County Superior Court for general use in complex asbestos litigation within that county, trial of these consolidated cases was bifurcated into "damages" and "liability" phases (heard by separate juries).[2] In the first damages phase of trial, the jury was to determine, as to each plaintiff, whether exposure to asbestos was a proximate cause of injury (i.e., whether plaintiff was suffering from asbestos-related disease or, as here, plaintiffs' decedent had died from asbestos-related disease) and, if so, the total amount of resulting damages.

---

[1]Proposition 51 (Civ. Code, § 1431 et seq.), adopted by the voters in 1986, provides that in a tort action governed by principles of comparative fault, a defendant shall not be jointly liable for the plaintiff's *noneconomic* damages, but shall only be severally liable for such damages "in direct proportion to that defendant's percentage of fault." (Civ. Code, § 1431.2, subd. (a).)

[2]Occasionally, an asbestos plaintiff will proceed to a third phase at which he will attempt to establish punitive damages against one or more defendants. For reasons that will become clear, there was no punitive damages phase in the *Rutherford* action. One of the four remaining consolidated actions did proceed to a third punitive damages phase against defendant Owens-Illinois, leading to a hung jury and no award of punitive damages against defendant. (*Anderson* v. *Owens-Illinois, Inc.,* review granted Oct. 19, 1995 (S047602), briefing deferred pursuant to rule 29.3, Cal. Rules of Court.)

Plaintiffs presented medical evidence that Rutherford had died of asbestos-related lung cancer. He had worked aboard ships around asbestos insulators at Mare Island starting in 1940. Although Rutherford's answers to interrogatories reflected he had never himself worked as an installer of asbestos insulation, he nevertheless had been exposed to respirable asbestos dust on a daily basis during periods of his employment at Mare Island. Three weeks before his death, Rutherford had furnished a medical history recounting his heavy exposure to asbestos products similar to that of other sheet metal workers in the shipyard. In 1985 he first noticed he would tire quickly and get out of breath easily. In 1986 Rutherford was diagnosed with lung cancer and underwent surgery. A year later a cancerous tumor was discovered in his head. He received radiation treatments but died three weeks later. Evidence was also presented that Rutherford had smoked approximately a pack of cigarettes a day over a period of 30 or more years until he quit smoking in 1977. As will be explained, this evidence took on heightened relevance at the second "liability" phase of trial.

At the end of the first phase of trial, the jury answered the question, "Did the decedent, Charles Rutherford, have lung cancer legally caused by his inhalation of asbestos fibers?" in the affirmative. The jury returned a verdict finding that a total of $278,510 in economic damages had been incurred by plaintiffs, and $280,000 in noneconomic damages suffered by plaintiffs as a result of decedent's death. Owens-Illinois has not challenged the damages phase jury's verdict finding Rutherford's injuries and death were proximately caused by his exposure to asbestos, nor has it challenged the plaintiffs' total award of economic and noneconomic damages.

Between the first and second phases of trial, nearly all the defendants except Owens-Illinois settled with plaintiffs.[3] The second liability phase thus involved only issues of Owens-Illinois's percentage of fault and apportionment of damages. At this phase of trial, the Rutherford plaintiffs elected to proceed under the burden-shifting instruction authorized, once again, under the procedures adopted by the Solano County Superior Court for general use in complex asbestos litigation within that county. The instruction (Solano County Complex Asbestos Litigation General Order No. 21.00 (hereafter Solano County General Order No. 21.00, or the burden-shifting instruction)) will be discussed in greater detail below. Briefly, the instruction, available in

---

[3]The record reflects that before his death, Rutherford identified three additional asbestos manufacturers to whose products he believed he had been exposed: Johns-Manville, Unarco and Amatex. The parties suggest those manufacturers were not named as defendants because they were bankrupt. Owens-Illinois further states in its brief that of the 19 named defendants in the Rutherford action, "[o]nly one of these entities—Owens-Illinois—remained through trial, because the rest of them settled with, or were dismissed by plaintiffs. Thus . . . it was a case in which almost every defendant implicitly acknowledged its potential for liability."

asbestos personal injury actions tried on a products liability theory, provides that if the plaintiff has proved that a particular asbestos supplier's product was "defective," that the plaintiff's injuries or death were legally caused by asbestos exposure *generally*, and that he was exposed to asbestos fibers from the defendant's product, the burden then shifts to the defendant to prove, if it can, that its product was not a legal cause of the plaintiff's injuries or death.

Each plaintiff in these consolidated actions sought to show that he (or in this case, plaintiffs' decedent) had been exposed to asbestos fibers from the asbestos-containing insulation product known as Kaylo that was manufactured by Owens-Illinois from 1948 to 1958. This product, which was produced in block and pipe-covering forms, contained both amosite and chrysotile asbestos fibers. John McKinley, who worked as an electrician at Mare Island, recalled working with Rutherford in the early 1950's. He testified that Rutherford and he were often required to go down into fire rooms and engine rooms as part of their jobs, and that when they were working in those areas, the asbestos dust looked like a "Texas dust storm." McKinley specifically remembered working with Rutherford below decks on board ships while the laggers were ripping out insulation. The deposition testimony of Milton Reed was also introduced at the second phase of trial. Reed, an insulator and pipe coverer at Mare Island, testified that during the 1940's and 1950's Owens-Illinois's insulation product, Kaylo, was used extensively at the shipyard, and that the product gave off visible dust when used.

Medical testimony was also presented to establish that the plaintiffs' asbestos-related disease was "dose-related," i.e., that the risk of developing asbestsos-related cancer increased as the total occupational dose of inhaled asbestos fibers increased. Dr. Allan Smith, a professor of epidemiology, testified that asbestos-related lung cancers are dose-related diseases, and that all occupational exposures through the latency period can contribute to the risk of contracting the diseases. Owens-Illinois's own medical expert, Dr. Elliot Hinckes, testified that asbestos-related cancers are dose responsive, and that if a worker had occupational exposure to many different asbestos-containing products, each such exposure would contribute to the degree of risk of contracting asbestos-related lung cancer, although he testified further that a very light or brief exposure could be considered "insignificant or at least nearly so" in the "context" of other, very heavy exposures. There was no evidence in this case that Rutherford had been exposed predominantly to any one kind or brand of asbestos product. All of the evidence regarding Rutherford's asbestos exposure was specifically related to industrial-occupational exposure, i.e., exposure to asbestos products while they were being installed or removed at Mare Island.

Owens-Illinois was allowed to establish that other asbestos manufacturers, and the plaintiffs' various employers, shared comparative fault for the plaintiffs' long-term exposure to asbestos. Owens-Illinois was also permitted to present evidence that smoking was a "negligent" contributing factor to each plaintiff's condition. Undisputed evidence indicated that smoking sharply increases the risk of lung disease, including lung cancer, and works "synergistically" with asbestos exposure to enhance the severity of resulting damage to the lungs. The trial court's instructions made clear that each plaintiff's entire recovery must be reduced to the extent of his own comparative "negligence" contributing to his condition, because each had continued to smoke tobacco long after he had notice that smoking was hazardous to health, and that the long-term consumption of tobacco products could be a contributing cause of lung disease.

As previously noted, Owens-Illinois further sought permission to establish that, in addition to Rutherford's own comparative fault for smoking, and the fault assigned to other asbestos manufacturers and to employers, cigarette manufacturers also shared fault for plaintiffs' injuries because they supplied the harmful tobacco products plaintiffs had consumed. Owens-Illinois urged that under Proposition 51, the proportionate fault of tobacco companies for plaintiffs' injuries should further reduce, to that extent, Owens-Illinois's liability for the plaintiffs' noneconomic damages. The trial court ruled that no "tobacco company defense" could be presented because the tobacco companies "aren't on trial here," and excluded all proffered evidence concerning the fault of cigarette manufacturers, refusing to allow a verdict form in which fault could be apportioned to those entities. (See *Richards, supra,* 14 Cal.4th at p. 991.)

The liability phase jury was instructed to assign percentages of fault for each injury, adding up to a total of 100 percent, among (1) the plaintiff himself (here, plaintiffs' decedent); (2) Owens-Illinois; (3) other manufacturers of asbestos to which the plaintiff or decedent was exposed; and (4) each employer that contributed to the exposure. In Rutherford's case, the jury apportioned fault as follows: 1.2 percent to Owens-Illinois, 2.5 percent to Rutherford himself, and 96.3 percent to the remaining entities to which the jury was allowed to assign fault. After further adjustment for pretrial settlements, the Rutherford plaintiffs recovered a net judgment of $177,047 in economic damages and $2,160 in noneconomic damages against defendant Owens-Illinois.[4]

Owens-Illinois appealed. In its Court of Appeal briefs, Owens-Illinois asserted as trial errors the denial of its tobacco company defense, the giving

---

[4]In *Richards, supra,* 14 Cal.4th at page 992, footnote. 4, we explained that the parties to that appeal were not challenging the general applicability of Proposition 51 to the case. Here too, plaintiffs have explained in their brief on the merits that "Because Charles Rutherford died

of the burden-shifting instruction, and several other unrelated evidentiary issues of no direct concern to us on review. The Court of Appeal reversed on the same ground that led it to reverse the judgment in *Richards*; it concluded, erroneously, that the trial court's rejection of the proffered tobacco company defense in these consolidated actions was prejudicial error under this court's earlier decision in *DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593 [7 Cal.Rptr.2d 238, 828 P.2d 140]. (See *Richards, supra*, 14 Cal.4th at p. 992.)

The Court of Appeal, in very perfunctory fashion, also resolved the other issues raised by Owens-Illinois. All but one of Owens-Illinois's remaining arguments were rejected; the Court of Appeal ruling, for purposes of guidance "in the event of a retrial," that the aforementioned burden-shifting instruction was "erroneous" under the recent decision by Division One of the First District Court of Appeal in *Lineaweaver* v. *Plant Insulation Co.* (1995) 31 Cal.App.4th 1409 [37 Cal.Rptr.2d 902], and should not again be given on retrial. (See *Richards, supra*, 14 Cal.4th at p. 1003.)

Plaintiffs' petition for review herein raised both the tobacco company defense and burden-shifting issues. In its answer to the petition, Owens-Illinois confined itself to the same two issues, and did not exercise its right to present other aspects of the Court of Appeal's decision for our consideration. (See Cal. Rules of Court, rule 28(e)(5).) Though we issued no order specifically limiting the issues on review, the parties' briefs on the merits are likewise concerned only with those two issues.

Our holding in *Richards, supra*, 14 Cal.4th 985, is dispositive of the tobacco company defense issue presented in this appeal. The actions were consolidated and jointly tried at the liability phase, the trial court made one order disallowing the defense to Owens-Illinois vis-à-vis all the plaintiffs, and the Court of Appeal treated the issue in a single substantive discussion in its opinion in that case, reversing the judgment in this case with a citation to its opinion and holding in *Richards* filed six weeks earlier.[5] As was our conclusion in *Richards,* because the Court of Appeal incorrectly awarded Owens-Illinois a new trial to pursue its tobacco company defense, we must

---

before trial, and the case was converted into a wrongful death case, and because there were substantial pretrial settlements, the Rutherford plaintiffs have not contested the issue of the application of Civil Code section 1431.2 [Proposition 51] to this appeal." Although the issue of when a cause of action for asbestos-related latent injuries "accrues" for the specific purpose of determining whether Proposition 51 can be applied prospectively in a latent injury case has been decided by this court in *Buttram* v. *Owens-Corning Fiberglas Corp.* (1997) 16 Cal.4th 520 [66 Cal.Rptr.2d 438, 941 P.2d 71], we will accept plaintiffs' election not to challenge the applicability of Proposition 51 to this case for the reasons given by them.

[5]The parties to this appeal and their counsel, who were also counsel of record in *Richards*, have likewise indicated in their briefs their understanding that *Richards* was the lead case in which the tobacco company defense issue would be resolved.

likewise reverse that aspect of the judgment of the Court of Appeal in the instant case. (*Id.* at p. 1003.)

Our decision in *Richards, supra,* 14 Cal.4th 985, however, provides no guidance on the burden-shifting issue. Plaintiff Richards did not challenge the Court of Appeal's ruling on that issue on review of his judgment in this court. In its answer, Owens-Illinois likewise directed its arguments to the issue of the tobacco company defense, and did not exercise its right to present other aspects of the Court of Appeal's decision for our consideration. Accordingly, we confined our decision in *Richards* to the tobacco company defense issue. (*Richards, supra,* 14 Cal.4th at p. 1003.) Here, in contrast, plaintiffs' petition for review did contest the correctness of the Court of Appeal's determination that the trial court erred in giving the burden-shifting instruction, and Owens-Illinois in turn has sought to defend the Court of Appeal's ruling in that regard. When we granted review in this case, briefing on the burden-shifting issue was ordered deferred pending our disposition in *Coughlin* v. *Owens-Illinois, Inc.*■ (Cal.App.), in which case the same issue, involving a closely related instruction (Alameda County Superior Court Complex Asbestos Litigation General Order No. 7.07) on which the Solano County burden-shifting instruction here in issue was assertedly patterned, was also pending and briefed. Subsequently, we issued an order designating the instant action as the lead case on the burden-shifting issue and requesting the parties to address in their briefs the questions set out in the margin.[6]

Consequently, although that aspect of the judgment of the Court of Appeal granting Owens-Illinois a new trial on the tobacco company defense issue must be reversed pursuant to our holding in *Richards, supra,* 14 Cal.4th 985, we are additionally confronted in this appeal with the further holding by the Court of Appeal that the burden-shifting instruction given below was erroneous, a holding which, unlike the procedural posture of *Richards,* has been challenged on review by the plaintiffs, with the issue now fully briefed by both parties and various amici curiae. We conclude the Court of Appeal correctly determined plaintiffs should not have been permitted to elect to proceed under the Solano County burden-shifting instruction. We also find,

[6]"1. Does the burden-shifting instruction authorized in Solano County comport or conflict with existing California authorities on concurrent causation (see BAJI No. 3.77)? [¶] 2. What is the source or sources of local rule making authority for such an instruction? [¶] 3. What is the source of authority and rationale behind the requirement that the plaintiff waive any claim for punitive damages in order to obtain the benefit of the burden-shifting instruction? [¶] 4. How does the decision in *Lineaweaver* v. *Plant Insulation Co.* (1995) 31 Cal.App.4th 1409 [on which the Court of Appeal *exclusively* relied to find the burden-shifting instruction given in this case invalid] bear upon our resolution of the burden-shifting issue in this case?"

however, that defendant has not demonstrated prejudice from the instructional error. Accordingly, we shall reverse the judgment of the Court of Appeal pursuant to our holding in *Richards, supra,* 14 Cal.4th 985.

### III. *Discussion.*

#### 1. *Preliminary Considerations; Solano County Superior Court's Local Rulemaking Authority in Complex Asbestos Litigation.*

Owens-Illinois urged the Court of Appeal to reverse the liability (second phase of trial) verdicts on the ground that the trial court improperly shifted the burden to defendant to prove that its products were not a legal cause of Rutherford's injuries and death. The argument is supported by several amici curiae.[7]

Upon plaintiffs' election, the trial court instructed the jury at the second liability phase of trial pursuant to Solano County General Order No. 21.00. Under this order, at the commencement of the liability phase of an asbestos products liability action (tried under either the consumer expectation or risk/benefit theories of product liability), the plaintiff "shall elect whether to request that all defendants carry the burden of proof regarding the legal cause of the plaintiff's or plaintiff's decedent's injury as to each said defendant. [¶] The plaintiff so requesting [the burden-shifting instruction] must, as to each defendant, prove by a preponderance of the evidence each of the following: [¶] a) That the asbestos product manufactured or distributed by said defendant was defective; [¶] b) That plaintiff's or plaintiff's decedent's injury was legally caused by his exposure to or contact with asbestos fibers, or products containing asbestos, and [¶] c) That plaintiff's exposure to or contact with asbestos fibers, or products containing asbestos, included exposure to or contact with such fibers or products manufactured or distributed by said defendant. [¶] The burden shall then shift to each defendant to prove by a preponderance of the evidence that this product was not a legal cause of the plaintiff's or plaintiff's decedent's injury. [¶] If plaintiff relies on this shifting of the burden of proof, there is deemed to be

---

[7]Fibreboard Corporation has filed an amicus curiae brief in support of Owens-Illinois on the burden-shifting issue. Additionally, this court's order designating the instant matter as the lead case on this issue indicated that "[a]ll amicus curiae briefs filed in *Coughlin* v. *Owens-Illinois* (Cal.App.), which address the burden-shifting instructional issue, and all briefs filed in that case in reply thereto, shall be considered by this court in deciding the issue in the instant case." The following organizations and entities filed briefs amicus curiae on the burden-shifting issue in *Coughlin* v. *Owens-Illinois* in support of the defendants in that appeal: Plant Insulation Company; General Motors Corporation; Fibreboard Corporation; Kaiser Gypsum Company, Inc.; and the Center For Claims Resolution.

a waiver by plaintiff of any claim for punitive damages."[8] The record reflects that Owens-Illinois generally objected to the giving of Solano County General Order No. 21.00 in this case.

Code of Civil Procedure section 575.1, subdivision (a), is one source of legislative authority for local judicial rulemaking. That section provides that "[t]he presiding judge of each superior . . . court may prepare . . . proposed local rules designed to expedite and facilitate the business of the court. The rules . . . may provide for the supervision and judicial management of actions from the date they are filed."

The Judicial Council has also adopted standards applicable to local judicial rulemaking. "The Judicial Council has adopted suggested procedures for processing complex civil cases which require specialized management to avoid placing unnecessary burdens on the trial courts or litigants. (Cal. Standards Jud. Admin., § 19 (Deering's Cal. Ann. Codes, Rules (Appen.) (1988 ed.) pp. 620-621 (hereafter Standards).) The complex litigation procedure is intended to facilitate pretrial resolution of evidentiary and other issues, and to minimize the time and expense of lengthy or multiple trials. (*Vermeulen* v. *Superior Court* (1988) 204 Cal.App.3d 1192, 1195-1196 [251 Cal.Rptr. 805].)" (*Asbestos Claims Facility* v. *Berry & Berry* (1990) 219 Cal.App.3d 9, 14 [267 Cal.Rptr. 896].)

The San Francisco and Alameda County Superior Courts have each designated all cases filed in their respective courts involving death and

---

[8]The precise wording of the burden-shifting instruction as given in this case was as follows:

"Plaintiffs in the Rutherford case have the burden of proving by a preponderance of the evidence all of the facts necessary to establish the following claim of liability against defendant Owens-Illinois:

"(A) Under plaintiffs' claim that Owens-Illinois—let me start that again.

"Under plaintiffs' claim that Owens-Illinois' Kaylo pipe and block insulation were defective in design, plaintiff must establish by a preponderance of the evidence:

"(1) That Owens-Illinois was a manufacturer of asbestos-containing thermal—I am having problems—let me start over again.

"That Owens-Illinois was a manufacturer of asbestos-containing thermal insulation materials called Kaylo.

"(2) That Owens-Illinois' Kaylo insulation products contained asbestos when they left the possession of the defendant.

"(3) That the decedent Charles Rutherford inhaled asbestos fibers as a result of exposure to or contact with asbestos-containing Kaylo made by Owens-Illinois.

"(4) That Owens-Illinois' Kaylo insulation products were being used at the time of such exposure or contact in a manner intended or reasonably foreseeable by the defendant.

"(5) That Kaylo insulation products of Owens-Illinois failed to perform as safely as an ordinary consumer would expect.

"(B) Defendant Owens-Illinois has a preponderance of the evidence to establish [*sic*]:

"(1) that the exposure to Owens-Illinois' Kaylo was not a legal cause of Charles Rutherford's injury and death."

injury due to asbestos exposure as complex litigation under section 19 of the Standards, and in each of those jurisdictions a procedure has been established for the issuance of general orders applicable to every asbestos case in that court. (See *Asbestos Claims Facility* v. *Berry & Berry, supra,* 219 Cal.App.3d at p. 14.) The record in this case reflects that Solano County has adopted similar procedures.

It is also well established that courts have fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation before them. (*Cottle* v. *Superior Court* (1992) 3 Cal.App.4th 1367, 1377 [5 Cal.Rptr.2d 882].) "In addition to their inherent equitable power derived from the historic power of equity courts, all courts have inherent supervisory or administrative powers which enable them to carry out their duties, and which exist apart from any statutory authority. (*Bauguess* v. *Paine* (1978) 22 Cal.3d 626, 636-637 [150 Cal.Rptr. 461, 586 P.2d 942]; *Peat, Marwick, Mitchell & Co.* v. *Superior Court* (1988) 200 Cal.App.3d 272, 287-288 [245 Cal.Rptr. 873].) 'It is beyond dispute that "Courts have inherent power . . . to adopt any suitable method of practice, both in ordinary actions and special proceedings, if the procedure is not specified by statute or by rules adopted by the Judicial Council." [Citation.]' (*Citizens Utilities Co.* v. *Superior Court* (1963) 59 Cal.2d 805, 812-813 [31 Cal.Rptr. 316, 382 P.2d 356], fn. omitted.) That inherent power entitles trial courts to exercise reasonable control over all proceedings connected with pending litigation . . . in order to insure the orderly administration of justice. (See *Hays* v. *Superior Court* (1940) 16 Cal.2d 260, 264-265 [105 P.2d 975].) 'Courts are not powerless to formulate rules of procedure where justice demands it.' (*Adamson* v. *Superior Court* (1980) 113 Cal.App.3d 505, 509 [169 Cal.Rptr. 866], citing *Addison* v. *State of California* (1978) 21 Cal.3d 313, 318-319 [146 Cal.Rptr. 224, 578 P.2d 941].) The Legislature has also recognized the authority of courts to manage their proceedings and to adopt suitable methods of practice. (See Code Civ. Proc., §§ 128, 187.)" (*Asbestos Claims Facility* v. *Berry & Berry, supra,* 219 Cal.App.3d at p. 19.)

As Owens-Illinois correctly points out, however, regardless of their source of authority, "trial judges have no authority to issue courtroom local rules which conflict with any statute" or are "inconsistent with law." (*Kalivas* v. *Barry Controls Corp.* (1996) 49 Cal.App.4th 1152, 1160 [57 Cal.Rptr.2d 200]; *Asbestos Claims Facility* v. *Berry & Berry, supra,* 219 Cal.App.3d at p. 19.) If the burden-shifting instruction embodied in Solano County General Order No. 21.00 conflicts with any statewide statute, rule of law, or Judicial Council rule, then it is an inappropriate exercise of that court's powers under section 19 of the Standards, as described in *Asbestos Claims Facility* v. *Berry & Berry, supra,* 219 Cal.App.3d at page 14. Nor could such a conflicting

instruction, adopted by the superior court of a county and applicable only to cases filed in that county, be viewed as a valid exercise of the court's inherent judicial powers to adopt procedures for resolving, among other matters, recurring evidentiary issues in complex asbestos litigation brought within its jurisdiction.

Assuming, for sake of argument, the legal validity of a burden-shifting instruction such as that adopted in Solano County, obvious concerns are raised by a situation in which a fundamental theory of tort liability (alternative liability) is applied or not applied to a category of cases (asbestos personal injury actions) depending only on an exercise of local rulemaking authority in matters of complex litigation. Although we question the propriety of resolving by local court rule a matter as substantive as whether the doctrine of "alternative liability" is applicable to asbestos-related latent personal injury actions, the scope of the Solano County Superior Court's local rulemaking authority need not be pursued further here. As next shown, the burden-shifting instruction embodied in Solano County General Order No. 21.00 should not have been given in this case because the theoretical predicate for a burden shift on causation—i.e., the need of an asbestos plaintiff to rely on a theory of alternative liability to establish causation and thereby perfect his action to recover damages for asbestos-related latent injuries—is lacking.

## 2. *Alternative Liability and Burden Shifting.*

 We are in basic agreement with Owens-Illinois and those courts that have concluded asbestos plaintiffs can meet their burden of proving legal causation under traditional tort principles, without the need for an "alternative liability" burden-shifting instruction. Indeed, the burden-shifting instruction offered in Solano County appears in conflict with certain aspects of these basic tort principles, and with standardized instructions on which the liability phase jury in this case was also instructed.

Generally, the burden falls on the plaintiff to establish causation. (*Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588, 597 [163 Cal.Rptr. 132, 607 P.2d 924] (*Sindell*).) Most asbestos personal injury actions are tried on a products liability theory. In the context of products liability actions, the plaintiff must prove that the defective products supplied by the defendant were a substantial factor in bringing about his or her injury. (*Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 127 [104 Cal.Rptr. 433, 501 P.2d 1153]; *Endicott* v. *Nissan Motor Corp.* (1977) 73 Cal.App.3d 917, 926 [141 Cal.Rptr. 95, 9 A.L.R.4th 481]; see BAJI No. 3.76.)

 California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations. (*Mitchell* v.

*Gonzales* (1991) 54 Cal.3d 1041, 1044, fn. 2, 1052, fn. 7 [1 Cal.Rptr.2d 913, 819 P.2d 872].) Under that standard, a cause in fact is something that is a substantial factor in bringing about the injury. (*Id.* at pp. 1052-1053; Rest.2d Torts, § 431, subd. (a), p. 428; BAJI No. 3.76 (8th ed. 1994).) The substantial factor standard generally produces the same results as does the "but for" rule of causation which states that a defendant's conduct is a cause of the injury if the injury would not have occurred "but for" that conduct. (*Mitchell* v. *Gonzales, supra,* 54 Cal.3d at p. 1053; Prosser & Keeton on Torts (5th ed. 1984) § 41, p. 266.) The substantial factor standard, however, has been embraced as a clearer rule of causation—one which subsumes the "but for" test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact. (*Mitchell* v. *Gonzales, supra,* 54 Cal.3d at pp. 1052-1053; *Thomsen* v. *Rexall Drug & Chemical Co.* (1965) 235 Cal.App.2d 775, 783 [45 Cal.Rptr. 642]; Prosser & Keeton on Torts, *supra,* § 41, pp. 266-268.)

The term "substantial factor" has not been judicially defined with specificity, and indeed it has been observed that it is "neither possible nor desirable to reduce it to any lower terms." (Prosser & Keeton on Torts, *supra,* § 41, p. 267.) This court has suggested that a force which plays only an "infinitesimal" or "theoretical" part in bringing about injury, damage, or loss is not a substantial factor. (*People* v. *Caldwell* (1984) 36 Cal.3d 210, 220 [203 Cal.Rptr. 433, 681 P.2d 274].) Undue emphasis should not be placed on the term "substantial." For example, the substantial factor standard, formulated to aid plaintiffs as a broader rule of causality than the "but for" test, has been invoked by defendants whose conduct is clearly a "but for" cause of plaintiff's injury but is nevertheless urged as an insubstantial contribution to the injury. (Prosser & Keeton on Torts (5th ed., 1988 supp.) § 41, pp. 43-44.) Misused in this way, the substantial factor test "undermines the principles of comparative negligence, under which a party is responsible for his or her share of negligence and the harm caused thereby." (*Mitchell* v. *Gonzales, supra,* 54 Cal.3d at p. 1053.)

██ An instruction shifting the burden of proof on causation constitutes a fundamental departure from these principles, and can only be justified on a showing of necessity for application of the specific theory of causation— alternative liability—first approved by this court in the celebrated case of *Summers, supra,* 33 Cal.2d 80. Solano County General Order No. 21.00 was apparently based on the alternative liability theory and patterned on a similar burden-shifting instruction adopted in Alameda County [9]

*Summers* involved a hunting accident in which two quail hunters negligently fired their shotguns in the direction of the plaintiff at about the same

[9]The validity of the Alameda County Superior Court burden-shifting instruction—Alameda County Complex Asbestos Litigation General Order No. 7.07—upon which the Solano

time. A single birdshot pellet struck plaintiff in the eye, causing serious injury. It was impossible to determine which of the negligent hunters had fired the single pellet, but it was clear only one of them had to have directly caused the injury. This court concluded both hunters could be found jointly and severally liable for plaintiff's injuries. We observed that each defendant was a wrongdoer who had acted negligently toward an innocent plaintiff, and that together the two had brought about a situation in which the negligence of one of them had injured the plaintiff. Under the then applicable traditional proximate cause standards, the plaintiff would have been unable to establish which defendant had caused his eye injury. To remedy this problem, the lower court shifted to each defendant the burden of proving, if he could, that he was *not* the cause of plaintiff's injury. We approved of the procedure. (33 Cal.2d at p. 86.)

A number of important factors present in *Summers* thus combined to lead this court to conclude that it would be fair and just to apply the theory of alternative liability and its concomitant burden-shifting rule. First, all the tortfeasors were named as defendants and before the court—the two hunters. In certainty one of them had caused the plaintiff's eye injury; there were no other potential tortfeasors. Second, it was established in *Summers* that each hunter was a wrongdoer who had acted negligently in firing his shotgun in the direction of the plaintiff at about the same time. Nor were there any facts to distinguish the nature or extent of the negligent conduct of each defendant; they were coequals from the standpoint of fault. Third, the plaintiff's injury was instantaneous and indivisible (as opposed to a latent, progressively deteriorating injury). Fourth, there was no contributing or concurrent causation—one of the hunters was the cause-in-fact of the entirety of plaintiff's injury resulting from a single shotgun pellet lodging in his eye. There was no factual basis on which to *apportion* "fault" or liability for the injury. Finally, given the nature of the injury, the plaintiff in *Summers* was

County instruction was patterned is pending before us in *Coughlin* v. *Owens-Illinois, Inc.**(Cal.App.). It appears from the record in this case that the Solano County instruction did, indeed, originate from the Alameda County instruction, which in turn was perceived as a necessary response to the asbestos plaintiff lawyers' argument that a plaintiff's inability to trace or prove which defendant's asbestos product's fibers in fact caused or contributed to their latent diseases and injury would preclude recovery without such an instruction. The 1987 Alameda County order adopting a burden-shifting instruction cited as authority only *Summers, supra*, 33 Cal.2d 80, and *Pereira* v. *Dow Chemical Co.* (1982) 129 Cal.App.3d 865 [181 Cal.Rptr. 364], which opinion summarily applied the alternative liability theory to a plaintiff's indivisible injury resulting from occupational exposure to toxic chemcials. In urging the Solano County Superior Court to adopt the burden-shifting instruction, the attorneys for asbestos plaintiffs cited primarily the same decisions, and argued that without the instruction they could not prove causation because it was medically impossible to identify which defendant's product's fibers were the actual causes of their clients' injuries.

without any evidentiary means whatsoever to prove from which hunter's shotgun the injurious single pellet had been fired. In short, given the facts of *Summers*, without the burden-shifting instruction the tortfeasors would have escaped liability, leaving the injured plaintiff without the legal means to seek redress for his negligently inflicted injuries.

The *Summers* alternative liability theory was incorporated in the Restatement Second of Torts, section 433B, subdivision (3), pages 441-442 (Section 433B(3)), which provides: "Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each actor to prove that he has not caused the harm."

The express language of Section 433B(3) therefore envisions the theory of alternative liability to be applicable as between two or more defendants only where all have been shown to be tortfeasors in the first instance, and where the conduct of only one of them caused the harm. The comments to Section 433B(3) are in accord. Comment g to Section 433B(3), at page 446, states that the burden shifts to the defendant only if the plaintiff can demonstrate that all defendants "acted tortiously and that the harm resulted from the conduct of . . . one of them." And comment h indicates that the theory of alternative liability is generally limited to cases where the defendants' conduct creates a substantially similar risk of harm ("The cases thus far decided in which the rule stated in Subsection (3) has been applied have all been cases in which all of the actors involved have been joined as defendants. All of these cases have involved conduct simultaneous in time, or substantially so, and all of them have involved conduct of substantially the same character, creating substantially the same risk of harm, on the part of each actor. . . ."). (*Ibid.*)

The majority of courts have refused to extend the doctrine of alternative liability and its burden-shifting rule to asbestos-related latent personal injury actions brought against multiple suppliers of asbestos products. These cases have found the factors which support application of *Summers* alternative liability and burden shifting readily distinguishable from the facts typically involved in complex asbestos litigation.

For example, in *Goldman v. Johns-Manville Sales Corp.* (1987) 33 Ohio St.3d 40 [514 N.E.2d 691] (*Goldman*), the Supreme Court of Ohio rejected application of *Summers* alternative liability/burden shifting to asbestos personal injury actions, concluding that given the nature of such litigation, it is often the case that the culpable party or parties will not be before the court, making a *Summers*-type burden shift unfair to the named defendants standing

trial. The *Goldman* court observed that "[i]n asbestos litigation, it is often uncertain that the culpable party is before the court. There are over one hundred sixty-five companies that have produced or supplied these products. Special Project: An Analysis of the Legal, Social and Political Issues Raised by Asbestos Litigation (1983) 36 Vanderbilt L.Rev. 573, 581, fn. 22. In addition, the largest producer of asbestos products, Johns-Manville, is no longer amenable to suit because of its reorganization. Even if Johns-Manville were amenable to suit, however, the only way to make sure that the guilty defendant was before the court would be to sue *all* asbestos companies." (*Goldman, supra,* 514 N.E.2d at p. 697, italics in original.)

The *Goldman* court also observed that the wide variation in form and toxicity of asbestos products further distinguishes asbestos cases from the facts of *Summers,* making the burden-shifting rule inappropriate in such cases. "Asbestos-containing products do not create similar risks of harm because there are several varieties of asbestos fibers, and they are used in various quantities, even in the same class of product." (*Goldman, supra,* 514 N.E.2d at p. 697.)

In *Vigiolto v. Johns-Manville Corp.* (W.D.Pa. 1986) 643 F.Supp. 1454 (*Vigiolto*), the United States District Court for the Western District of Pennsylvania likewise rejected application of *Summers* alternative liability/burden shifting to asbestos litigation. Focusing on the differing propensities of various forms of asbestos products to cause injury and disease, the *Vigiolto* court quoted from a decision of the Supreme Court of Florida that explained: " 'Asbestos products . . . have widely divergent toxicities, with some asbestos products presenting a much greater risk of harm than others. *See generally* Locks, *Asbestos-Related Disease Litigation. Can the Beast be Tamed?,* 28 Vill.L.Rev. 1184 (1982-1983); Note, *Issues in Asbestos Litigation,* 34 Hastings L.J. 871, 889-95 (1983); Comment, *An Examination of Recurring Issues in Asbestos Litigation,* 46 Alb.L.Rev. 1307, 1325-29 (1982). This divergence is caused by a combination of factors, including: the specific type of asbestos fiber incorporated into the product; the physical properties of the product itself; the percentage of asbestos used in the product. There are six different asbestos silicates used in industrial applications and each presents a distinct degree of toxicity in accordance with the shape and the aerodynamics of the individual fibers. Further, it has been established that the geographical origin of the mineral can affect the substance's harmful effects. A product's toxicity is also related to whether the product is in the form of a solid block or a loosely packed insulating blanket and to the amount of dust a product generates. The product's form determines the ability of the asbestos fibers to become airborne and, hence, to be inhaled or ingested. The greater the product's susceptibility to produce

airborne fibers, the greater the product's potential to produce disease. Finally, those products with high concentrations of asbestos fibers have corresponding high potentials for inducing asbestos-related injuries.'" (*Vigiolto*, *supra*, 643 F.Supp. at p. 1463, quoting *Celotex Corp.* v. *Copeland* (Fla. 1985) 471 So.2d 533, 537-538.)

In *Sindell*, *supra*, 26 Cal.3d 588, this court too *rejected* application of a pure *Summers* alternative liability theory—in the case that went on to establish an important variation of that doctrine, "market share liability"— under circumstances where all potential tortfeasors that may have actually caused plaintiff's injuries were not before the court as named defendants in the lawsuit.

*Sindell* involved a class action for personal injuries allegedly resulting from prenatal exposure to the antimiscarriage drug diethylstilbestrol (DES) which had been manufactured by any one of a potentially large number of defendants. Plaintiff could not identify which particular defendant had manufactured the drug responsible for her injuries. However, her complaint alleged that defendants were jointly and individually negligent in that they had manufactured, marketed and promoted DES as a safe drug to prevent miscarriage without adequate testing or warning of its dangerous side effects; collaborated in their marketing methods, promotion and testing of the drug; relied on each other's test results; adhered to an industry-wide safety standard; and produced the drug from a common and mutually agreed upon generic formula. (26 Cal.3d at pp. 604-605.)

In concluding that a pure *Summers*-type alternative liability theory was *unavailable* to plaintiffs under those facts, we explained in *Sindell*: "There is an important difference between the situation involved in *Summers* and the present case. There, all the parties who were or could have been responsible for the harm to the plaintiff were joined as defendants. Here, by contrast, there are approximately 200 drug companies which made DES, any of which might have manufactured the injury-producing drug.

"Defendants maintain that, while in *Summers* there was a 50 percent chance that one of the two defendants was responsible for the plaintiff's injuries, here since any one of 200 companies which manufactured DES might have made the product that harmed plaintiff, there is no rational basis upon which to infer that any defendant in this action caused plaintiff's injuries, nor even a reasonable possibility that they were responsible.

"These arguments are persuasive if we measure the chance that any one of the defendants supplied the injury-causing drug by the number of possible

tortfeasors. In such a context, the possibility that any of the five defendants supplied the DES to plaintiff's mother is so remote that it would be unfair to require each defendant to exonerate itself. There may be a substantial likelihood that none of the five defendants joined in the action made the DES which caused the injury, and that the offending producer not named would escape liability altogether. While we propose, *infra*, an adaptation of the rule in *Summers* which will substantially overcome these difficulties, defendants appear to be correct that the [*Summers* alternative liability/ burden-shifting] rule, as previously applied, cannot relieve plaintiff of the burden of proving the identity of the manufacturer which made the drug *causing* her injuries." (*Sindell, supra,* 26 Cal.3d at pp. 602-603, fns. omitted, italics added.)[10]

Although many of the above cited cases focus on the fact that not all potential tortfeasors may be before the court to ensure that the *actual* tortfeasor will be held liable if it cannot disprove its role in causing plaintiff's injuries, or that different toxicities and brands of asbestos products and their differing effects on different asbestos-related diseases make it inappropriate to apply a *Summers* alternative liability/burden-shifting rule to asbestos cases, we believe the most fundamental reason why a burden-shifting instruction is unnecessary to proving an asbestos-related cancer latent injury case becomes clear when the limits on the plaintiff's burden of proof on causation are properly understood. A fuller analysis of the medical problems and uncertainties accompanying factual proof of causation in an asbestos cancer case will serve to illustrate the point.

At the most fundamental level, there is scientific uncertainty regarding the biological mechanisms by which inhalation of certain microscopic fibers of asbestos leads to lung cancer and mesothelioma. Although in some cases medical experts have testified that asbestos-related cancer is the final result of the fibrosis (scarring) process (see *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 37-39 [52 Cal.Rptr.2d 690]), a general reference on the subject describes the link between fibrosis and carcinogenesis as "a debated issue for which further extensive analysis is needed." (1 Encyclopedia of Human Biology (1991) Asbestos, p. 423.) An answer to this biological question would be legally relevant, because if each episode of scarring contributes cumulatively to the formation of a tumor or the conditions allowing such formation, each significant exposure by the plaintiff to asbestos fibers would be deemed a cause of the plaintiff's cancer; if, on the other hand, only one fiber or group of fibers actually causes the

---

[10]It should be noted there is no contention here that a *Sindell* "market share" theory of liability is applicable to asbestos actions. Plaintiffs have expressly indicated in their briefs they do not contend *Sindell* market share liability is applicable to this case.

formation of a tumor, the others would not be legal causes of the plaintiff's injuries.

If, moreover, the question were answered in favor of the latter (single cause) theory, another question—apparently unanswerable—would arise: *which* particular fiber or fibers actually caused the cancer to begin forming. Because of the irreducible uncertainty of the answer, asbestos-related cancer would, under the single-fiber theory of carcinogenesis, be an example of alternative causation, i.e., a result produced by a single but indeterminable member of a group of possible causes. The disease would thus be analogous to the facts of the hunting accident in *Summers*, *supra*, 33 Cal.2d 80.

Apart from the uncertainty of the causation, at a much more concrete level uncertainty frequently exists whether the plaintiff was even exposed to dangerous fibers from a product produced, distributed or installed by a particular defendant. The long latency periods of asbestos-related cancers mean that memories are often dim and records missing or incomplete regarding the use and distribution of specific products. In some industries, many different asbestos-containing products have been used, often including several similar products at the same time periods and worksites. Not uncommonly, plaintiffs have been unable to prove direct exposure to a given defendant's product. (See, e.g., *Lineaweaver v. Plant Insulation Co.*, *supra*, 31 Cal.App.4th at pp. 1420-1421; *Dumin v. Owens-Corning Fiberglas Corp.* (1994) 28 Cal.App.4th 650, 655-657 [33 Cal.Rptr.2d 702]; *Viglioto*, *supra*, 643 F.Supp. at pp. 1455-1456.)

Finally, at a level of abstraction somewhere between the historical question of exposure and the unknown biology of carcinogenesis, the question arises whether the risk of cancer created by a plaintiff's exposure to a particular asbestos-containing product was significant enough to be considered a legal cause of the disease. Taking into account the length, frequency, proximity and intensity of exposure, the peculiar properties of the individual product, any other potential causes to which the disease could be attributed (e.g., other asbestos products, cigarette smoking), and perhaps other factors affecting the assessment of comparative risk, should inhalation of fibers from the particular product be deemed a "substantial factor" in causing the cancer? (See, e.g., *Greathouse v. Amcord, Inc.* (1995) 35 Cal.App.4th 831, 837 [41 Cal.Rptr.2d 561]; *Lineaweaver v. Plant Insulation Co.*, *supra*, 31 Cal.App.4th at pp. 1416-1417.)

The burden of proof as to exposure is not disputed in this case. Even with the jury instruction at issue, plaintiffs bore the burden of proof on the issue of exposure to the defendant's product; plaintiffs do not complain of that

burden, which is properly theirs under California law. Only in one circumstance have we relieved toxic tort plaintiffs of the burden of showing exposure to the defendant's product: where hundreds of producers had made the same drug from an identical formula, practically precluding patients from identifying the makers of the drugs they took. (*Sindell, supra,* 26 Cal.3d at pp. 610-613.) Plaintiffs do not here argue that a comparable situation exists with asbestos makers justifying adoption of a market-share liability theory. (See *ante,* fn. 10, at p. 974.)

Nor is the burden of proof as to the mechanism of carcinogenesis disputed here; defendant *concedes* that plaintiff does not bear such a burden to "connect the manufacturer and the fibers." Asbestos plaintiffs, Owens-Illinois acknowledges, "are *not* required to identify the manufacturer of specific fibers" that caused the cancer. We agree: Plaintiffs cannot be expected to prove the scientifically unknown details of carcinogenesis, or trace the unknowable path of a given asbestos fiber. But the impossibility of such proof does not dictate use of a burden shift. Instead, we can bridge this gap in the humanly knowable by holding that plaintiffs may prove causation in asbestos-related cancer cases by demonstrating that the plaintiff's exposure to defendant's asbestos-containing product in reasonable medical probability[11] was a substantial factor in contributing to the aggregate *dose* of asbestos the plaintiff or decedent inhaled or ingested, and hence to the *risk* of

---

[11]The *Lineaweaver* court articulated what it believed should be the standard of proof applicable to medical evidence of the biological processes that cause injury or disease, in evaluating whether exposure to the defendant's asbestos products was a *substantial factor* in causing the disease or injuries. The standard is this: "is there a reasonable medical probability based upon competent expert testimony that the defendant's conduct contributed to plaintiff's injury. [Citations.]" (*Lineaweaver* v. *Plant Insulation Co., supra,* 31 Cal.App.4th at p. 1416, fn. omitted.)

We recognize *Lineweaver* was a negligence case, and that the above quoted standard was derived from medical malpractice cases. (*Lineaweaver* v. *Plant Insulation Co., supra,* 31 Cal.App.4th at p. 1416, fn. 2; see, e.g., *Bromme* v. *Pavitt* (1992) 5 Cal.App.4th 1487, 1498 [7 Cal.Rptr.2d 608]; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 967 p. 357 ["the evidence must be sufficient to allow the jury to infer that, in the absence of the defendant's negligence, there was a reasonable medical probability that the plaintiff would have obtained a better result."].) We nonetheless find the above-quoted standard, as modified and articulated in *Lineaweaver, supra,* 31 Cal.App.4th at page 1416, particularly well suited to proof of causation through expert medical evidence when applying the substantial factor test to asbestos personal injury actions brought on a negligence or products liability theory. The standard of "reasonable medical probability" has been adopted in at least one reported decision involving a carcinogenic pharmaceutical. (*Jones* v. *Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402 [209 Cal.Rptr. 456]; see also *Sparks* v. *Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 476 and fn. 11 [38 Cal.Rptr.2d 739] [citing the standard in an asbestos latent personal injury case tried on a products liability theory, but noting the court in *Lineaweaver, supra,* 31 Cal.App.4th 1409, had modified the standard slightly].) Moreover, we agree with the observation of the *Lineaweaver* court that the reference to "medical probability" in the standard "is no more than a recognition that asbestos injury cases (like

developing asbestos-related cancer, without the need to demonstrate that fibers from the defendant's particular product were the ones, or among the ones, that *actually* produced the malignant growth.

In refining the concept of legal cause we must also ensure that the triers of fact in asbestos-related cancer cases know the precise contours of the plaintiff's burden. The generally applicable standard instructions on causation are insufficient for this purpose. Those instructions tell the jury that every "substantial factor in bringing about an injury" is a legal cause (BAJI No. 3.76), even when more than one such factor "contributes concurrently as a cause of the injury" (BAJI No. 3.77). They say nothing, however, to inform the jury that, in asbestos-related cancer cases, a particular asbestos-containing product is deemed to be a substantial factor in bringing about the injury if its contribution to the plaintiff or decedent's *risk* or *probability* of developing cancer was substantial.

Without such guidance, a juror might well conclude that the plaintiff needed to prove that fibers from the defendant's product were a substantial factor *actually contributing* to the development of the plaintiff's or decedent's cancer. In many cases, such a burden will be medically impossible to sustain, even with the greatest possible effort by the plaintiff, because of the irreducible uncertainty regarding the cellular formation of an asbestos-related cancer. We therefore hold that, in the trial of an asbestos-related cancer case, although no instruction "shifting the burden of proof as to causation" to defendant is warranted, the jury should be told that the plaintiff's or decedent's exposure to a particular product was a substantial factor in causing or bringing about the disease if in reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's *risk* of developing cancer.

We turn, finally, to the aspect of uncertainty about causation that *is* directly disputed by the parties here—the question of which exposures to asbestos-containing products contributed significantly enough to the total occupational dose to be considered "substantial factors" in causing the disease. Who should bear the burden of proof, including the risk of nonpersuasion, on that question? On this point, we agree with defendant: in the absence of a compelling need for shifting the burden, it should remain with the plaintiff. The fundamental justification for a *Summers*-type shift of the burden is that without it all defendants might escape liability and the plaintiff be left "remediless." (*Summers, supra,* 33 Cal.2d at p. 86.) On the issue of which exposures to asbestos were substantial factors increasing the

---

medical malpractice cases) involve the use of medical evidence." (*Lineaweaver, supra,* 31 Cal.App.4th at p. 1416, fn. 2.)

risk of cancer, the difficulties of proof do not in general appear so severe as to justify a shift in the burden of proof. The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical. A standard instruction (BAJI No. 3.77) tells juries that each of several actors or forces acting concurrently to cause an injury is a legal cause of the injury "regardless of the extent to which each contributes to the injury." A plaintiff who suffers from an asbestos-related cancer and has proven exposure to inhalable asbestos fibers from several products will not, generally speaking, face insuperable difficulties in convincing a jury that a particular one of these product exposures, or several of them, were substantial factors in creating the risk of asbestos disease or latent injury. No burden-shifting instruction is therefore necessary on this question, and in the absence of necessity the justification for shifting part of the plaintiff's ordinary burden of proof onto a defendant also disappears.

While the above analysis provides fully adequate grounds for rejecting use of a burden-shifting instruction in the asbestos-related cancer context, we also note that, in other respects as well, asbestos-related cancer cases do not fit easily into the alternative liability model represented by *Summers*. As courts in California and other jurisdictions have observed, unlike the situation in *Summers*, asbestos cases often have less than the complete set of possible tortfeasors before the court, and do not display the same symmetry of "comparative fault" or "indivisible injury" as was the factual case in *Summers*.

As we have explained (*ante*, at pp. 972-973), in *Goldman*, *supra*, 514 N.E.2d 691, the Supreme Court of Ohio *rejected* application of *Summers* alternative liability/burden shifting to asbestos personal injury actions, concluding that given the nature of such litigation, it is often the case that the culpable party or parties will not be before the court, and that the wide variation in form and toxicity of asbestos products further distinguishes asbestos cases from the facts of *Summers*, making the burden-shifting rule inappropriate in such cases. Similarly, in *Vigiolto*, *supra*, 643 F.Supp. 1454, the United States District Court for the Western District of Pennsylvania likewise rejected application of *Summers* alternative liability/burden shifting to asbestos litigation, focusing on the differing propensities of various forms of asbestos products to cause injury and disease, and their " 'widely divergent toxicities.' " (*Vigiolto*, *supra*, 643 F.Supp. at p. 1463, quoting *Celotex Corp.* v. *Copeland*, *supra*, 471 So.2d at pp. 537-538; see *ante*, at pp. 972-973.)

The court in *Lineaweaver* v. *Plant Insulation Co.*, *supra*, 31 Cal.App.4th 1409 (*Lineaweaver*) likewise rejected a burden shift for similar reasons.

"Unlike *Summers*, there are hundreds of possible tortfeasors among the multitude of asbestos suppliers. As our Supreme Court has recognized, the probability that any one defendant is responsible for plaintiff's injury decreases with an increase in the number of possible tortfeasors. (*Sindell* v. *Abbott Laboratories*, *supra*, 26 Cal.3d at pp. 602-603.) When there are hundreds of suppliers of an injury-producing product, the probability that any of a handful of joined defendants is responsible for plaintiff's injury becomes so remote that it is unfair to require defendants to exonerate themselves. (*Id.*, at p. 603.) The probability that an individual asbestos supplier is responsible for plaintiff's injury may also be decreased by the nature of the particular product. Asbestos products have widely divergent toxicities. (*Mullen* v. *Armstrong World Industries, Inc.* (1988) 200 Cal.App.3d 250, 256 [246 Cal.Rptr. 32].) Unlike the negligent hunters of *Summers*, all asbestos suppliers did not fire the same shot. Yet, under a burden-shifting rule, all suppliers would be treated as if they subjected plaintiff to a hazard identical to that posed by other asbestos products." (*Lineaweaver*, *supra*, 31 Cal.App.4th at p. 1418.)

If there were a need for a burden-shifting instruction in order to relieve plaintiffs of the impossible task of proving which fiber or fibers actually caused their cancers, it might well be possible to tailor the instruction to overcome these problems. For example, the Alameda County burden-shifting instruction, unlike Solano County General Order No. 21.00, requires all known asbestos suppliers to which the plaintiff was exposed be joined, except those who have settled or are subject to a bankruptcy court stay order. It might also be possible to fashion an instruction that shifted the burden on causation only after the plaintiff had proven, in addition to exposure as such, sufficiently lengthy, intense and frequent exposure as to render the defendant's product a substantial factor contributing to the risk of cancer. As explained earlier, however, there is no need for such a tailored burden shifting instruction; instead, we have determined the jury should simply be told that legal causation can be shown through evidence of exposure to a defendant's product that in reasonable medical probability was a substantial factor contributing to the plaintiff's or decedent's risk of developing cancer. In any event, Solano County General Order No. 21.00 is clearly *not* properly tailored in the manner just described, and would therefore be erroneous even if a burden shift was deemed appropriate in an asbestos case such as this one.

Plaintiffs, in support of an extension of *Summers* alternative liability/burden shifting to asbestos litigation, also rely heavily on *Menne* v. *Celotex Corp.* (10th Cir. 1988) 861 F.2d 1453 (*Menne*). In *Menne* the Tenth Circuit Court of Appeals approved the concept of a burden-shifting instruction in an

asbestos-related cancer case "whereby the plaintiff's burden of proving causation is relaxed and defendants are charged with proving the absence of causation. . . . so that injured, innocent plaintiffs could overcome the frequently impossible burden of proving proximate cause under traditional tort standards." (*Id.* at p. 1464, fn. omitted.) The *Menne* court recognized that the burden shift it proposed was a *variation* of the alternative liability theory derived from this court's decision in *Summers*, because the asbestos defendants before the court were more accurately described as *concurrent* rather than alternative possible causes of plaintiff's injuries. (*Id.* at pp. 1465-1466.) Consequently, the *Menne* court chose to refer to the burden-shifting rule it fashioned as "concurrent liability" rather than "alternative liability." (*Id.* at pp. 1467, fn. 21, 1468.)

We agree with the observation of the court in *Lineaweaver, supra,* 31 Cal.App.4th 1409, that the rationale of *Menne* is flawed. The *Menne* court concluded that "[s]hifting the burden [of proof] seems at least as fair where *some,* if not all, defendants are shown to have contributed *some* of the harm as where only *one* of them is thought to have caused *all* the harm: in the former situation a liable defendant will be shown at least to have actually caused *some* harm; in the latter a defendant who is entirely innocent of causing any of the . . . injury can be found liable." (*Menne, supra,* 861 F.2d at p. 1467, italics in original.) The *Lineaweaver* court concluded that such reasoning "simply begs the causation question. If plaintiff had, as the *Menne* court assumes, shown that some defendants caused the harm, then plaintiff would have proven causation against some defendants and would have no need for a burden-shifting rule against all defendants. In truth, *Menne* . . . would require every joined defendant to exonerate itself upon nothing more than plaintiff's showing of exposure to defendants' asbestos products, some of which *may* have caused harm. Again, we return to probabilities and, as discussed, the probability that a particular asbestos supplier joined as a defendant has caused a plaintiff's injury is often remote given the hundreds of possibly responsible parties and the unequal hazards posed by different asbestos products." (*Lineaweaver, supra,* 31 Cal.App.4th at p. 1419.)

Finally, plaintiffs also place considerable reliance on *Pereira v. Dow Chemical Co., supra,* 129 Cal.App.3d 865 (*Pereira*) in support of their claim that *Summers* alternative liability/burden shifting should be extended to asbestos litigation. *Pereira* was a toxic chemical spill case, not an asbestos latent injury action. The plaintiff in *Pereira* developed a kidney disorder after spilling a toxic resin (DER 599) on his skin during the course of his employment. The plaintiff sued the manufacturer of DER 599 and also sued three other chemical manufacturers who supplied other toxic chemicals to his employer (Midcor). (*Id.* at pp. 868-869, 872.) As an alternative to the

theory that his renal failure was caused by the single DER 599 spill, the plaintiff also alleged that his injuries were caused by cumulative exposure to four separate chemicals supplied to his employer by the four named defendants over a five-year period. (*Id.* at p. 872.) The trial court in *Pereira* entered summary judgments in defendants' favor, concluding plaintiff had failed to adequately establish causation under traditionally applicable tort principles.

The *Pereira* Court of Appeal reversed. The entirety of the *Pereira* court's rationale for applying *Summers* alternative liability/burden shifting to the facts before it can be found in the following single paragraph of the opinion: "Under the circumstances, it is not plaintiffs' duty to identify which of the vapors caused or contributed to the chronic renal failure but, rather, [it] is the duty of the defendants who supplied Midcor with their products to prove the contrary. *Summers* v. *Tice* (1948) 33 Cal.2d 80, 85-86 [199 P.2d 1, 5 A.L.R.2d 91], states that '"The real reason for the rule that each joint tortfeasor is responsible for the whole damage is the practical unfairness of denying the injured person redress simply because he cannot prove how much damage each did, when it is certain that between them they did [it] all; let them be the ones to apportion it among themselves."' (See also *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588, 600 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061].)" (*Pereira, supra,* 129 Cal.App.3d at p. 873.)

Several concerns immediately come to mind regarding the soundness of the underpinnings of the holding in *Pereira*. First, the case arose on a summary judgment motion; hence plaintiff need only have shown a reasonable *possibility* that the defendants' chemical products cumulatively contributed to his kidney failure, according to his alternative theory of liability in the case. (*Pereira, supra,* 129 Cal.App.3d at p. 872.) There was no factual record as yet developed to distinguish the harmful properties of the various chemicals to which plaintiff had been exposed, or to establish the probabilities that each, singly or in some combination, might have proximately caused plaintiff's kidney failure. In short, the *Pereira* court appears to have authorized a *Summers*-type burden shift without regard to the plaintiff's ability to otherwise establish proximate legal causation, on a proper evidentiary record, under traditionally applicable tort principles.

Second, the above noted single passage from *Summers* quoted and relied on in *Pereira* is really addressed to the matter of *apportionment of fault and damages*, i.e., the fairness, from the plaintiff's perspective, of applying a rule of *joint* and several liability where plaintiff cannot otherwise establish apportionment of fault and damages among the various named defendants. Shifting the burden of *apportionment of damages* to the defendants under such circumstances is not a new notion, for it has long been recognized that

a defendant has the right to join other parties who it believes bear a share of the responsibility for plaintiff's damages. Our opinion in *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899] made clear that one sued for personal injury could join other concurrent tortfeasors in the original action in order to allocate proportionate responsibility, or could seek equitable indemnity from such tortfeasors in proportion to their fault. (*Id.* at pp. 591-598, 604-607; see also *DaFonte* v. *Up-Right, Inc.*, *supra*, 2 Cal.4th 593, 598.)

Here, in contrast, we are concerned not with an instruction that merely shifts the burden of equitable apportionment of fault and damages to the defendants to settle among themselves, but instead with an instruction that shifts the burden of proof on a threshold component of proximate legal causation necessary to establish the defendant's liability. We have explained why asbestos cases are distinguishable in several important respects from those factors in *Summers* that justified application of a pure "alternative liability" theory and its concomitant burden shifting rule in that case. We conclude the *Pereira* court's single paragraph of analysis, and its seemingly misplaced reliance on the sole quoted passage from *Summers* noted above, cannot withstand scrutiny as valid precedent supportive of a burden-shifting instruction such as the one offered in Solano County.

In conclusion, our general holding is as follows. In the context of a cause of action for asbestos-related latent injuries, the plaintiff must first establish some threshold *exposure* to the defendant's defective asbestos-containing products,[12] *and* must further establish in reasonable medical probability that a particular exposure or series of exposures was a "legal cause" of his injury, i.e., a *substantial factor* in bringing about the injury. In an asbestos-related cancer case, the plaintiff need *not* prove that fibers from the defendant's product were the ones, or among the ones, that actually began the process of malignant cellular growth. Instead, the plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's *risk* of

---

[12]We do not here endorse any one particular standard for establishing the requisite *exposure* to a defendant's asbestos products, as the issue has not been raised or briefed in this case. We note that a number of different formulations have been applied, both in the reported California cases, and in federal and sister-state jurisdictions. (See, e.g., *Dumin* v. *Owens-Corning Fiberglas Corp.*, *supra*, 28 Cal.App.4th at p. 655 [applying "the most generous application of a lenient causation standard"]; *In re Hawaii Federal Asbestos Cases* (9th Cir. 1992) 960 F.2d 806, 816-817; *Blackstone* v. *Shook & Fletcher Insulation Co.* (11th Cir. 1985) 764 F.2d 1480, 1485 [stringent approach requiring particularized proof that the plaintiff came into contact with the defendant's product]; *Lockwood* v. *AC & S, Inc.* (1987) 109 Wn.2d 235 [744 P.2d 605, 613] [lenient approach; sufficient if plaintiff proves defendant's product was at his or her work site, but resolution depends on particular circumstances of each case].)

developing cancer. The jury should be so instructed.[13] The standard instructions on substantial factor and concurrent causation (BAJI Nos. 3.76 & 3.77) remain correct in this context and should also be given.

Turning to the case at bench, we find the use of the burden-shifting instruction embodied in Solano County General Order No. 21.00 to have been erroneous. In its objections to the general order, Owens-Illinois expressly conceded that asbestos plaintiffs could prove causation without tracing a fiber from a particular product to the cellular origin of the illness. The superior court should have accepted this concession and rejected the burden-shifting instruction as unnecessary. As discussed above, the court could properly have instead instructed the jury in this case that plaintiffs could prove causation by showing that exposure to Owens-Illinois's product Kaylo was in reasonable medical probability a substantial factor contributing to the decedent's risk of developing lung cancer.

### 3. *Prejudice.*

Lastly, we face the question of prejudice from the giving of the erroneous burden-shifting instruction in this case. Owens-Illinois asserts that the instruction deprived it of its jury trial right on causation and "[t]he verdict must be reversed on this basis alone." We have, however, recently considered and rejected precisely this theory of inherent prejudice from instructional error in civil cases. (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 573-580 [34 Cal.Rptr.2d 607, 882 P.2d 298].) Instead, we held, instructional error requires reversal only " 'where it seems probable' that the error 'prejudicially affected the verdict' " (*Id.* at p. 580.) The reviewing court should consider not only the nature of the error, "including its natural and probable effect on a party's ability to place his full case before the jury," but the likelihood of actual prejudice as reflected in the individual trial record, taking into account "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580-581.) Applying this analysis, we conclude defendant has failed to demonstrate a miscarriage of justice arose from the erroneous instruction.

First, the instruction in no way impaired defendant's ability to put its full case on substantial factor causation before the jury. The burden-shifting instruction would not, by its nature, result in exclusion of relevant defense

[13]Because plaintiffs' decedent died of asbestos-related lung cancer, our discussion here has focused on asbestos-related cancers rather than on asbestosis. We do not determine whether the standards and related instruction discussed herein apply in *asbestosis* cases, but observe, on the basis of the scientific evidence before us, little ground to suppose a burden-shifting instruction would be appropriate in a case involving asbestosis.

evidence, and nothing we have found in the record suggests the defense was precluded from presenting any evidence it possessed on the question of whether its product was a substantial factor increasing decedent's risk of cancer. Both parties introduced evidence relevant to determining the proportion of asbestos-containing insulation used at Mare Island, during the period of decedent's employment there, that was supplied by defendant. Both parties also presented expert medical testimony on the relationship between asbestos exposure and lung cancer. A defense expert opined that while each occupational exposure contributed some amount to the risk of cancer, a very light or brief exposure could be considered "insignificant or at least nearly so" in the "context" of other, very heavy exposures. Plaintiffs' expert presented a generally contrary opinion, to the effect that each exposure, even a relatively small one, contributed to the occupational "dose" and hence to the risk of cancer.

Second, other instructions minimized the importance of burden of proof as to the substantial factor issue. Pursuant to BAJI No. 3.77, the jury was told that each concurrent factor contributing to the injury is a legal cause "regardless of the extent to which each contributes to the injury." Even if plaintiffs had borne the burden of proving exposure to Kaylo was a substantial factor creating decedent's risk of cancer, it is unlikely the jury, in light of BAJI No. 3.77, would have accepted defendant's argument that the degree of risk such exposure contributed was too small to be considered a legal cause of the illness.

Third, the arguments of counsel suggest the burden-shifting instruction played little or no role at trial. The defense argued primarily that plaintiffs had not met their burden of showing decedent was ever exposed to inhalable fibers from Kaylo, defendant's product. Plaintiffs' counsel, of course, argued plaintiffs had met that burden. Secondarily, both sides discussed what portion of decedent's asbestos exposure was attributable to Kaylo and whether such exposure was a substantial factor compared to all the other sources of cancer risk. Neither attorney drew the jury's attention to the instruction shifting the burden on this issue. Plaintiffs' counsel, in fact, expressly took on the burden the instruction shifted to the defense: "In this case, we don't have to prove that the entire injury of the plaintiffs was caused by Kaylo. *We have to prove that Kaylo was a part of that.* [¶] In the jury instructions you'll see something called a substantial contributing factor. That's a definition of a legal cause." (Italics added.) Defense counsel, of course, did not correct his colleague's misstatement.

Finally, the record does not contain any indications the jury was actually misled. To the contrary, the jury's verdict suggests that, regardless of the

burden shift, it accepted much of the defense's *factual* theory, concluding that exposure to Kaylo contributed a relatively small amount to decedent's cancer risk, but rejected defendant's argument that such a small contribution should be considered insubstantial. Thus the jury found inhalation of fibers from Kaylo was a substantial causative factor, but allocated only 1.2 percent of the total legal cause to defendant's comparative fault. (2.5 percent of the total cause was allocated to the decedent's own fault, 25 percent to that of decedent's employer, and the remainder, divided by type of product, to makers of other asbestos-containing products used at the shipyard.) From the jury's low estimate of defendant's share of causation, it appears they resolved most of the factual uncertainty in defendant's favor despite the burden-shifting instruction. In the absence of any instruction or evidence that a small amount was necessarily insubstantial, and guided by BAJI No. 3.77's command that every contributing cause was a legal cause regardless of the degree of its contribution, the jury concluded even 1.2 percent of the cause was, on the facts of this case, substantial. A different result seems unlikely to have ensued had they been correctly instructed plaintiffs bore the burden of showing exposure to Kaylo was a substantial factor increasing the decedent's risk of developing lung cancer.

We are, for these reasons, unconvinced the instructional error was prejudicial.

## IV. *Conclusion.*

Although the Court of Appeal correctly determined Solano County General Order No. 21.00 should not have been given in this case, no miscarriage of justice has been shown to have resulted from the trial court's error in giving the burden-shifting instruction. However, that aspect of the Court of Appeal's judgment reversing the trial court's judgment for failing to permit Owens-Illinois to present a tobacco company defense was error requiring reversal under *Richards* v. *Owens-Illinois, Inc., supra,* 14 Cal.4th 985, 988-989. The judgment of the Court of Appeal is reversed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**MOSK, J.**—I dissent.

As in the companion case, *Buttram* v. *Owens-Corning Fiberglas Corp.* (1997) 16 Cal.4th 520 [66 Cal.Rptr.2d 438, 941 P.2d 71], the majority's holding will deprive numerous innocent plaintiffs suffering from so-called "latent" diseases caused by exposure to asbestos in the workplace of full

compensation for injuries inflicted by tortfeasors. In my view, the burden-shifting instruction at issue is generally consistent with state law and was properly given in this matter. Although the point is not technically at issue here, I would also observe that use of the burden-shifting instruction should *not* require waiver of any punitive damages claim.

## I.

Charles Rutherford worked as a sheet metal worker at the Mare Island Naval Shipyard for 40 years. During 10 of those years, from 1940 to 1950, he worked on ships around asbestos insulators. He brought this action, against various manufacturers of asbestos, including Owens-Illinois, Inc. (hereafter Owens-Illinois), after he discovered that he had contracted lung cancer; after his death, the action was amended by his wife and daughter to allege wrongful death. Owens-Illinois manufactured the product "Kaylo," containing asbestos; Kaylo was one of the products used at Mare Island between 1940 and 1950.

In the first phase of a trifurcated trial, the jury found that Rutherford had cancer legally caused by his inhalation of asbestos fibers. By the second phase of trial, all defendants had settled except for Owens-Illinois. The burden-shifting instruction given to the jury in this phase, Solano County Complex Asbestos Litigation General Order No. 21.00, required plaintiffs to prove, by a preponderance of the evidence, the following: (a) the asbestos product manufactured or distributed by Owens-Illinois was defective; (b) Rutherford's injury was legally caused by his exposure to or contact with asbestos products; and (c) he was exposed to, or had contact with, an asbestos product manufactured by Owens-Illinois. The burden then shifted to Owens-Illinois to prove, by a preponderance of the evidence, that its product was not the legal cause of the injury. By electing the burden-shifting instruction, plaintiffs were deemed to waive any claim against Owens-Illinois for punitive damages.

The jury found for plaintiffs. Owens-Illinois does not dispute the jury's determination that its product was defective. Nor does it dispute the jury's finding that Rutherford's injury was legally caused by his exposure to asbestos or that its products were used at Rutherford's workplace. It contends that it should not have been required to carry the burden of proof that its product was not the legal cause of the injury.[1]

Unlike the majority, I conclude that the burden-shifting instruction was proper. Its rationale derives from the nature of asbestos-related injury.

---

[1]For purposes of products liability, a cause of injury is something that is a "substantial factor" in bringing about an injury. (See *Endicott* v. *Nissan Motor Corp.* (1977) 73 Cal.App.3d 917, 926 [141 Cal.Rptr. 95, 9 A.L.R.4th 481]; *Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041,

Plaintiffs suffering from the effects of industrial exposure to asbestos typically were exposed to the substance from many products. Here, for example, the plaintiffs sought to prove that asbestos-related cancer is caused by the cumulative effect of all such exposure. Thus, although any given exposure may not have been enough itself to cause injury, each exposure contributed to the inflammation process that eventually results in asbestos-related disease. The question is only the extent of harm caused by each such exposure.[2]

It appears that relatively light exposure to asbestos places a worker at risk for asbestos-related diseases. (See *Borel* v. *Fibreboard Paper Products Corporation* (5th Cir. 1973) 493 F.2d 1076, 1083; *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 37-39 [52 Cal.Rptr.2d 690].) Nonetheless, a defendant may contend that its contribution to the total asbestos exposure was so slight that it cannot be considered a substantial factor. As a practical matter, it is, moreover, difficult or impossible to determine which exposure or exposures actually caused the disease. Without a burden-shifting instruction, if each defendant argues that its product was only a small part of a plaintiff's total exposure, and that it therefore could not have been a substantial factor in causing his injury, there is a risk that a jury might find that *no* one manufacturer was responsible for the injury, even though all of the manufacturers together caused the harm. This is particularly true in light of the exceptionally long latency periods from initial exposure to the onset of asbestos-related disease and the nature of the typical industrial environment, involving multiple exposures to various asbestos products over a period of time.[3]

1052-1054 [1 Cal.Rptr.2d 913, 819 P.2d 872]; Rest.2d Torts, § 431, p. 428.) The majority understand the term as including any factor that is more than "infinitesimal" or "theoretical," but propose what appears to be a stricter standard for plaintiffs in asbestos cases, i.e., proof of the "biological processes" causing the injury to a reasonable "medical probability."

[2]This theory—that all defendants have contributed to the harm, but that the degree of harm is uncertain—is distinct from the theory of "alternative causation" covered under BAJI No. 3.80, in which one defendant is a legal cause of the injury, but one or more are definitely *not*. (See *Summers* v. *Tice* (1948) 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91].) It is well established that a burden-shifting instruction is appropriate in alternative causation cases. (*Ibid.*; *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061].)

[3]Asbestos defendants are also more likely to have access to information concerning the use of their product at a specific workplace; to the extent that such information no longer exists, e.g., through routine destruction of business records, it is fair to place the burden on defendants. Moreover, it appears that many asbestos manufacturers knew, or should have known, about the hazards of exposure to their products in the workplace long before such information was available to individuals like Rutherford. (See *Buttram* v. *Owens-Corning Fiberglas Corp.*, *supra*, 16 Cal.4th at p. 546, fn. 3 (dis. opn. of Mosk, J.) ["In this matter . . . the jury found that '[u]se of an asbestos-containing product manufactured, supplied or distributed by Owens-Corning Fiberglas [Kaylo] involved a substantial danger known or knowable to Owens-Corning Fiberglas that would not be readily recognized by the ordinary

Without the burden-shifting instruction, it would appear that many innocent plaintiffs who were unknowingly exposed to products such as Kaylo in the workplace would face serious, even insurmountable, difficulties in establishing that exposure to a specific defendant's defective product was a substantial cause of injury. Indeed, although the majority assert that, "in general," no "insuperable barriers" prevent a plaintiff from meeting the burden of proof, even defendant concedes that in many cases the placement of the burden of proof will be dispositive. This is particularly true in light of the majority's requirement that plaintiffs must bear the formidable burden of establishing legal cause through factors including frequency of exposure, regularity of exposure, proximity of the asbestos product to plaintiffs, and other possible sources of plaintiffs' injury. With a burden-shifting instruction, the risk is avoided because each defendant bears the burden of proving that its own contribution to plaintiff's exposure was *not* a substantial factor in his resulting disease.[4]

The burden-shifting instruction also finds support in the holding in *Pereira* v. *Dow Chemical Co.* (1982) 129 Cal.App.3d 865 [181 Cal.Rptr. 364]. *Pereira* was an action to recover damages for personal injuries for a permanent kidney disorder sustained by an employee after a chemical spill at his place of employment. The plaintiff also claimed injury from the cumulative effect of his exposure to chemical products manufactured or distributed by the various defendants, which were used at his workplace for several years. He was unable, however, to prove which exposure or exposures caused his injury. The Court of Appeal held that the burden of proof on the issue should rest with the defendants. "Under the circumstances, it is not plaintiffs' duty to identify which of the vapors caused or contributed to the chronic renal failure but, rather, it is the duty of the defendants who supplied [his employer] with their products to prove the contrary." (*Id.* at p. 873.)

Owens-Illinois argues that the burden-shifting instruction was improper because plaintiffs in other jurisdictions have been able to prove, without

consumer of the product' and that it 'failed to give an adequate warning of the danger.' "]; *Borel* v. *Fibreboard Paper Products Corporation, supra,* 493 F.2d at pp. 1083-1085.)

[4]A burden-shifting instruction is particularly appropriate in cases, like this, involving numerous defendants. "In concurrent cause cases involving just two or three wrongdoers, a plaintiff frequently can demonstrate the substantiality of each defendant's contribution even though the exact proportion of each's contribution to the single harm may not be ascertainable. As the number of wrongdoers mounts, however, it becomes increasingly difficult to demonstrate each[] [tortfeasor's] substantial contribution to the whole. It is under such circumstances that a burden shift with respect to causation can be usefully employed." (*Menne* v. *Celotex Corp.* (10th Cir. 1988) 861 F.2d 1453, 1466, fn. 19.) Plaintiffs here named 19 different defendants. Other manufacturers or distributors whose asbestos products were used at the Mare Island facility were not joined because they were subject to a bankruptcy stay order.

such burden shifting, that a defendant's product was a substantial factor in causing asbestos-related disease. It is unclear, however, precisely what was the plaintiffs' burden of proof in those jurisdictions, e.g., whether the court imposed a more lenient standard of proof of exposure than the one adopted here. If the burden-shifting instruction were truly unnecessary, it seems unlikely that Owens-Illinois would so strenuously urge that we hold it invalid.

Under the circumstances of this case, I believe the burden-shifting instruction was proper. It bears repeating that plaintiffs' burden remained substantial: they were required to establish that the Owens-Illinois's product, Kaylo, was defective, that Rutherford was exposed to Kaylo, and that he sustained an asbestos-related injury. Only then did the burden of proof shift to Owens-Illinois to show that his exposure to its product was not a substantial factor, i.e., a legal cause of, the injury.

## II.

Although I conclude that the trial court properly gave the burden-shifting instruction in this matter, it erred in conditioning its use on plaintiffs' waiver of any claim for punitive damages. It appears that the trial court relied on *Magallanes* v. *Superior Court* (1985) 167 Cal.App.3d 878 [213 Cal.Rptr. 547]. Its reliance was misplaced.

*Magallanes* involved a suit against multiple defendants based on the market share theory of liability we crafted in *Sindell* v. *Abbott Laboratories, supra,* 26 Cal.3d 588. *Sindell* involved a situation in which the plaintiff was unable to identify which of numerous defendants manufactured the drug that actually caused her injury. We held that it was reasonable to "measure the likelihood that any of the defendants supplied the product which allegedly injured plaintiff by the percentage which the [drug] sold by each of them . . . bears to the entire production of the drug sold by all defendants for that purpose." (*Id.* at pp. 611-612.) The burden then would shift to the defendants to demonstrate that they could not have made the drug that injured the plaintiff. (*Id.* at p. 612.) *Magallanes* held that punitive damages are not available in such a case because they were intended to individualize punishment of wrongdoers and, in a *Sindell*-type action, there could be no finding of individual wrongdoing.

*Magallanes* is, of course, distinguishable from the present case. Plaintiffs did not base their action on a market share theory. They were required, under the burden-shifting instruction, to prove that they were exposed to asbestos

manufactured by the specific defendant. Under the circumstances, I discern no valid reason why they should have been precluded from seeking punitive damages.

Appellant's petition for a rehearing was denied October 22, 1997, and the opinion was modified to read as printed above. Mosk, J., was of the opinion that the petition should be granted.