Filed 10/28/15  Marteney v. Union Carbide Corp. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| MARIE MARTENEY,  Plaintiff and Respondent,  v.  UNION CARBIDE CORPORATION et al.,  Defendants and Appellants. | B252711c/wB253265 (Los Angeles County Super. Ct. No. BC489395) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John J. Kralik, Judge.  Affirmed.

Mayer Brown and Michele Odorizzi and Polsinelli and David K. Schultz for Defendant and Appellant Union Carbide Corporation.

Armstrong & Associates and William H. Armstrong for Defendant and Appellant Elementis Chemicals Inc.

Weitz & Luxenberg, Benno Ashrafi, Cindy Saxey and Josiah Parker for Plaintiff and Respondent Marie Marteney.

Marty and Marie Marteney asserted claims for negligence, strict liability, and loss of consortium against appellants Union Carbide Corporation (UCC) and Elementis Chemicals, Inc. (Elementis), alleging that asbestos they marketed caused Marty Marteney's mesothelioma. After the jury returned special verdicts in the Marteneys' favor on their claim for strict liability, appellants filed unsuccessful motions for judgment notwithstanding the verdict, and a judgment was entered awarding the Marteneys compensatory damages. Appellants challenge the denial of their motions for judgment notwithstanding the verdict. We reject their contentions, and affirm.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Beginning in or about 1963, UCC sold asbestos to various manufacturers, some of which made joint compounds used in the construction of walls. Elementis is the successor-in-interest of Harrisons & Crosfield (Pacific), Inc. and certain related entities (HCP), which distributed UCC asbestos. In 1958, Marty Marteney began working for an architectural firm as "job captain," and became a project architect. He also engaged in remodeling projects on his home, and worked as a volunteer on remodeling projects involving churches. In the course of his employment and other activities, he handled joint compounds. In April 2012, he was diagnosed as suffering from mesothelioma, which is a cancer of the lung's lining.

On August 1, 2012, the Marteneys filed their complaint for negligence, breach of warranties, strict liability, and loss of consortium against 21 defendants involved in the manufacture and marketing of asbestos-containing products, including joint compounds. The complaint alleged that Marty Marteney's

mesothelioma resulted from his exposure to asbestos from the defendants' products.  The Marteneys sought compensatory and punitive damages.

Prior to trial, the Marteneys entered into settlements with several defendants.  As a result of the settlements and other dispositions, on June 17, 2013, at the commencement of jury selection, UCC and Elementis were the sole remaining defendants in the action.  At trial, the key issues concerned the extent to which Marty Marteney was exposed to UCC asbestos through contact with three brands of joint compound -- Gold Bond, Paco Quick Set, and Georgia Pacific -- and the extent, if any, to which Elementis distributed the UCC asbestos to which he was so exposed.

The jury was instructed to return special verdicts regarding three theories of liability -- namely, negligence, strict liability based on a design defect, and strict liability based on a failure to warn -- and other issues.  The jury returned special verdicts in favor of the Marteneys solely on their claim for strict liability based on a design defect.  The jury also found that the Marteneys suffered non-economic damages totaling $1,175,000, but rejected their request for punitive damages.  The jury allocated UCC a five percent share of comparative fault, and Elementis a three percent share of comparative fault.

UCC filed a motion for judgment notwithstanding the verdict, contending, inter alia, that the Marteneys had failed to show that exposure to UCC asbestos was a substantial factor in the causation of Marty Marteney's mesothelioma, under the standard stated in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953 (*Rutherford*).  Elementis also submitted a motion for judgment notwithstanding the verdict, asserting there was no evidence that the asbestos it distributed was incorporated into any joint compound handled by Marty Marteney.  After denying the motions, on October 10, 2013, the trial court entered a judgment awarding the

Marteneys damages totaling $56,250 against UCC, and damages totaling $33,750 against Elementis.  On December 30, 2013, the judgment was amended to reflect an award of costs.  UCC and Elementis noticed appeals from the judgments, which were consolidated.[1]

## DISCUSSION

Appellants present overlapping contentions regarding the denials of their motions for judgment notwithstanding the verdict.  UCC contends (1) that the testimony from the Marteneys' experts regarding the causation of Marty Marteney's mesothelioma did not satisfy the *Rutherford* standard, (2) that there is insufficient evidence that Marty Marteney was exposed to its asbestos, (3) that the jury's special verdicts regarding the adequacy of UCC's product warnings shielded it from liability under a theory of strict liability based on a design defect, and (4) that the "design defect" theory fails under *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335 (*O'Neil*).  In addition to joining in those contentions, Elementis contends there is insufficient evidence that it distributed the asbestos to which Marty Marteney may have been exposed.  For the reasons discussed below, we reject their contentions.

A.  *Standard of Review*

As motions for judgment notwithstanding the verdict potentially conclude litigation on a complaint, the rules governing them are "strict" (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67

---

[1]    During the pendency of this consolidated appeal, Marty Marteney died.  For purposes of the appeal, Marie Marteney has been designated his successor in interest.

Cal.App.4th 743, 750), and "[t]he trial court's discretion in granting a motion for judgment notwithstanding the verdict is severely limited" (*Teitel v. First Los Angeles Bank* (1991) 231 Cal.App.3d 1593, 1603).  Generally, """[i]f the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied.  [Citations.]  'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict.  If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.'  [Citation.]"""  (*Id*. at p. 1603, quoting *Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 877-878 (*Clemmer*).)  In reviewing the trial court's ruling, we also examine the record for substantial evidence to support the verdict.  (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 845.)

B. *Causation*

We begin by examining appellants' contentions regarding the sufficiency of the evidence to support the special verdicts regarding their role in the causation of Marty Marteney's mesothelioma.  The jury found that he was exposed to UCC asbestos from three brands of joint compound, that Elementis distributed that UCC asbestos, that the "design" of the asbestos was a substantial factor in causing harm, and that appellants were responsible for a non-zero share of comparable fault for the Marteneys' injuries.  Appellants maintain there is insufficient evidence that UCC asbestos was a substantial factor in the causation of Marty Marteney's mesothelioma.  In addition, Elementis contends there is insufficient evidence that

5

its activities as a distributor of UCC asbestos support the imposition of strict liability for Marty Marteney's mesothelioma. As explained below, we disagree.

### 1. *Governing Principles*

In cases "presenting complicated and possibly esoteric medical causation issues," the plaintiff is obliged to establish """a reasonable medical probability based upon competent expert testimony that the defendant's conduct contributed to [the] plaintiff's injury.""" (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79, quoting *Rutherford*, *supra*, 16 Cal.4th at p. 976, fn. 11.) As explained in *Rutherford*, California applies the substantial factor test to so-called "cause in fact" determinations. (*Rutherford, supra*, at p. 969.) "Under that standard, a cause in fact is something that is a substantial factor in bringing about the injury. [Citations.] The substantial factor standard generally produces the same results as does the 'but for' rule of causation which states that a defendant's conduct is a cause of the injury if the injury would not have occurred 'but for' that conduct. [Citations.] The substantial factor standard, however, has been embraced as a clearer rule of causation -- one which subsumes the 'but for' test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact. [Citations.]" (*Id*. at pp. 968-969.) Although the term "substantial factor" has no authoritative definition, a force that "plays only an 'infinitesimal' or 'theoretical' part in bringing about injury" is not a substantial factor. (*Id*. at p. 969.)

*Rutherford* examined the relationship between the plaintiff's burden of proof and the substantial factor test in a specific context, namely, when the asbestos alleged to have caused the plaintiff's injuries potentially has multiple sources. There, the wife and daughter of a deceased metal worker sued numerous

manufacturers and distributors of asbestos-laden products, alleging that the metal worker's exposure to their products caused his fatal lung cancer. (*Rutherford*, *supra*, 16 Cal.4th at pp. 958-959.) Following the first phase of a bifurcated trial, after a jury found that the decedent's inhalation of asbestos fibers caused his cancer, all but one manufacturer settled with the plaintiffs. (*Id*. at p. 960.) During the second phase of trial, the jury heard testimony that the metal worker labored in confined areas of ships containing the manufacturer's asbestos-laden insulation. (*Id*. at p. 961.) The parties also presented expert testimony regarding asbestos-related cancers. (*Ibid*.) After receiving a burden-shifting instruction that the manufacturer had the burden of showing that its product did not cause the decedent's cancer, the jury allocated the manufacturer a 1.2 percent share of comparative fault. (*Id*. at pp. 961-962.) On appeal, the manufacturer challenged the instruction. (*Id*. at pp. 962-963.)

Our Supreme Court concluded that the case fell outside the special circumstances in which a burden-shifting instruction on causation is appropriate, notwithstanding the "'scientifically unknown details of carcinogenesis'" and the impossibility of identifying the "'specific fibers'" that caused an individual's cancer.[2] (*Rutherford*, *supra*, 16 Cal.4th at p. 976.) The court determined that the burden of proof remained on the plaintiff, subject to a specific quantum of proof. (*Id*. at p. 969-982.) Under that quantum of proof, plaintiffs may establish causation on the basis of expert testimony regarding the size of the "dose" or the enhancement of risk attributable to exposure to asbestos from the defendant's products. (*Id*. at p. 976, fn. 11.)

---

[2] As appellants do not suggest that the special circumstances are present here, they have forfeited any contention that the burden of proving causation is properly imposed upon respondents.

To "'bridge th[e] gap in the humanly knowable,'" the court adopted the following standard of proof: "In the context of a cause of action for asbestos-related latent injuries, the plaintiff must first establish some threshold *exposure* to the defendant's defective asbestos-containing products,[] *and* must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a *substantial factor* in bringing about the injury. In an asbestos-related cancer case, the plaintiff need *not* prove that fibers from the defendant's product were the ones, or among the ones, that actually began the process of malignant cellular growth. Instead, the plaintiff may meet the burden of proving that exposure to [the] defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's risk of developing cancer." (*Rutherford*, *supra*, 16 Cal.4th at pp. 976, 982, fn. omitted, italics deleted.)

The court further held that juries should be so instructed. (*Rutherford*, *supra*, 16 Cal.4th at p. 976.) Turning to the case before it, however, the court found no prejudice from the instructional error. (*Id*. at pp. 983-985.)

### 2. *Evidence at Trial*

#### a. *Marteneys' Evidence*

##### i. *UCC and HCP*

Beginning in the early 1960's, UCC mined asbestos in King City, California, and shipped it to product manufacturers. The asbestos was "a high purity . . . chrysotile type," and was marketed under the name, "Calidria." UCC marketed several grades of Calidria asbestos, including a grade known as "SG-210" for use in joint compounds. Joint compounds are used to cover the joints

8

between dry wall and wall board construction materials, and include ready-mix and dry powder products.

From the mid-1960's to 1986, HCP distributed Calidria to the west coast of the United States. UCC collaborated with HCP's manager located in San Francisco in distributing Calidria. Although UCC sometimes shipped Calidria directly, HCP participated in the profits from UCC's activities under an "exclusive distribution agreement."

In 1965, National Gypsum began making joint compounds -- marketed under the name "Gold Bond" -- in a factory in Long Beach, California. National Gypsum also made those products in plants located in Illinois, Maryland, and Louisiana. The Long Beach plant distributed its joint compounds to the states on the west coast of the United States, including California. In 1969, National Gypsum began making Gold Bond products using formulas "built around" UCC's SG-210, which National Gypsum viewed as superior to its prior asbestos ingredient. As of March 1970, UCC's SG-210 was the sole asbestos incorporated into the Gold Bond joint compounds made in Long Beach. Until the mid-1970's, the Long Beach plant relied on versions of the formulas adopted in and after 1969 in manufacturing Gold Bond products.

There was also evidence that during the pertinent period, Georgia Pacific and Kelly-Moore used Calidria in their joint compounds.[3] From late 1969 to mid-1977, Georgia Pacific incorporated Calidria in some of its joint compounds, which

[3]    As explained below (see pt. B.3.b., *post*), the principal evidence concerning Marty Marteney's exposure to UCC asbestos relies on his contact with Gold Bond joint compound, although he also encountered the Georgia Pacific and Paco Quick Set joint compounds.

were manufactured in plants located in Texas, Illinois, Georgia, New York, and Virginia. Only the Texas plant supplied joint compound products to California.

From 1963 to 1978, the Paco division of Kelly-Moore manufactured an asbestos-containing joint compound sold as "Quick Set." In addition, from 1968 to 1971, pursuant to an agreement, Kelly-Moore manufactured joint compound products for Georgia Pacific in California, where Kelly-Moore had plants in San Carlos and Ontario. In view of the agreement, Kelly-Moore made all Georgia Pacific asbestos-containing joint compounds sold in California. After 1971, some Georgia Pacific branches continued to sell Kelly-Moore products under the Georgia Pacific label. The products that Kelly-Moore made for Georgia Pacific in California were identical to its own product, and were distributed in California. From 1971 to 1973 and for a 15-month period after August 1975, UCC supplied Calidria to Kelly-Moore's San Carlos plant.[4]

### ii. *Marty Marteney*

Marty Marteney was born in 1931. At the age of nine, he began working regularly in his father's garage, where he replaced asbestos-containing brake linings on trucks. He also helped his father renovate car dealerships by installing asbestos sheets.

In 1956, after military service, Marteney moved to Los Angeles. From the late 1950's until 1971 or 1972, he worked for Levitt, an architectural firm. Initially employed as a "job captain," he was promoted to "project architect" after two and a half years, and eventually became a certified architect.

---

[4] In addition, appellants' evidence showed that from 1968 to 1978, UCC supplied 8 percent of the asbestos fiber that Kelly-Moore used, most of which was shipped to its California plants.

10

While employed by Levitt, Marteney worked "hands-on," visiting job sites. As a job captain, he spent 50 percent of his time in the field, and continued to spend 20 percent of his time in the field after becoming a project architect. He demonstrated how to mix construction materials, including joint compounds, and participated in applying the joint compounds. He recalled using Gold Bond, Georgia Pacific, and Paco Quick Set joint compounds, and was around other workers who used them. The work sites were dusty and dirty, and he was sometimes present when workers cleaned up after using joint compounds.

After leaving Levitt, Marteney secured employment with Ficus, another architectural firm. Sometime after 1972, he spent time at the site of a large hospital project, where workers used joint compounds. He recalled seeing bags labeled "Gold Bond" and "Georgia Pacific."

From 1965 to the mid-1970's, Marteney also remodeled his home, and volunteered to remodel many churches. In working on his home, he engaged in drywall work, and used "big bags" of Gold Bond, as well as Paco Quick Set. He also used Paco Quick Set in remodeling the churches.

### iii. *Expert Testimony*

Dr. Allan Smith, an epidemiologist, testified that the inhalation of asbestos dust is the major cause of mesothelioma. According to Smith, mesothelioma is a "dose response disease," that is, workers who have inhaled more asbestos or had a higher dose face a higher risk of developing mesothelioma. He further testified that chrysotile asbestos, the type of asbestos most used in the United States, causes mesothelioma. Responding to hypothetical questions, Smith opined that if a person with Marty Marteney's personal history suffered from mesothelioma, exposure to asbestos caused the disease. He further opined that each exposure to

asbestos would have contributed to the person's overall risk of acquiring the disease, stating that "every part of a causal dose that caused [the] cancer is important."

Dr. James Dahlgren, an expert in toxicology and occupational diseases, testified that by 1960, medical science had confirmed that asbestos exposure causes mesothelioma. Although all the main types of asbestos can cause mesothelioma, exposure to chrysotile asbestos is the "overwhelming cause" of the disease, as 95 to 99 percent of the asbestos used worldwide is of that type. Generally, mesothelioma is subject to a "dose response curve." Even very low levels of exposure to asbestos -- including short term exposures -- greatly increased the risk of mesothelioma. According to Dahlgren, workers exposed to .05 "fiber years" of asbestos -- one-half of the OSHA limit set in the late 1970's -- face a "statistically significant[] increase[]" in lung cancer and mesothelioma. He stated: "[T]here's no threshold, that is[,] no level below which there would be no effect."[5]

Responding to hypothetical questions, Dr. Dahlgren opined that exposure to asbestos would have caused the mesothelioma suffered by a person with Marty Marteney's personal history. He further opined that if the person's history included one or two exposures to joint compound products containing UCC asbestos, he would not exclude "those exposures as being causative for [the]

---

[5]     Dr. Dahlgren explained that a "fiber year[]" is a measure of the amount of asbestos fibers to which a person is exposed. An exposure of .1 fiber years -- the OSHA standard in the late 1970's -- is equivalent to exposure to air containing .1 fibers per cubic centimeter throughout an average working day for a one-year period. Dahlgren stated that the OSHA standard reflected the fact that in the late 1970's, available microscopes could not detect airborne fiber concentrations of less than .1 fibers per cubic centimeter.

12

mesothelioma." Dahlgren stated: "All those asbestos fibers . . . contributed to the risk."

### b. *UCC's Evidence*

William Dyson, an industrial hygienist, testified there is little data regarding the risk of mesothelioma at very low levels of exposure to asbestos. He opined that there was no increased risk from exposure to chrysotile from doses below the range of 15 to 25 fiber years.[6] Responding to hypothetical questions, Dyson opined that if a person worked with a joint compound containing UCC asbestos on ten two-hour occasions, that person's level of exposure would be approximately .02 fiber years, which Dyson characterized as "very, very low."

In addition, UCC submitted evidence that aside from trial batches, no Paco Quick Set joint compound was manufactured in California. According to that evidence, Paco Quick Set was made in Kelly-Moore's plants in Texas, although UCC supplied some asbestos to those plants in the early 1970's.

### c. *Elementis's Evidence*

Robert Mann, who testified as the person most knowledgeable regarding HCP, denied that HCP received a commission or credit for UCC's direct sales of Calidria. He further stated that there were several grades of Calidria asbestos, only one of which -- SG-210 -- was used in joint compounds, and that HCP distributed SG-210 to joint compound manufacturers only from 1973 to 1977.

---

[6]     Although Dyson relied on a unit measurement of exposure he called a "fiber year per cubic centimeter," he noted that the unit is often called a "fiber year[]," and his testimony establishes that he was relying on the unit measurement that Dr. Dahlgren also used. For simplicity, we use the term "fiber year."

### 3. *Sufficiency of Evidence Regarding the Role of UCC's Asbestos in Causing Marteney's Mesothelioma*

We begin with UCC's challenges to the special verdicts regarding the role of UCC's asbestos in causing Marty Marteney's mesothelioma. As explained above (see pt. B.2, *ante*), under *Rutherford*, at trial the Marteneys had the burden of proof with respect to two facts. They were obliged to establish (1) that Marty Marteney was exposed to UCC's asbestos, and (2) that "in reasonable medical probability," his exposure was a substantial factor in bringing about his mesothelioma. (*Rutherford*, *supra*, 16 Cal.4th at p. 982.) Regarding the second fact, the Marteneys could carry their burden by showing "in reasonable medical probability," that the exposure "was a substantial factor contributing to [Marteney's] risk of developing cancer." (*Id.* at pp. 982-983, italics deleted.)

UCC maintains the Marteneys failed to carry their burden regarding each fact. UCC argues that *Rutherford* imposed substantive requirements on testimony offered to show the second fact that the Marteneys' experts failed to satisfy. UCC further argues there is no evidence regarding the extent to which Marty Marteney was exposed to UCC asbestos. As explained below, we reject UCC's contentions because the record -- including the expert testimony, viewed collectively -- was sufficient to show that Marteney's exposure to UCC asbestos "was a substantial factor contributing to [his] risk of developing cancer." (*Id.* at p. 982.)

### a. *Adequacy of Expert Testimony*

UCC maintains that *Rutherford* imposed certain requirements on the showing required of plaintiffs to establish the second fact. As noted above (see pt. A.2., *ante*), in explaining the "substantial factor" test, the court stated: "Although the term 'substantial factor' has no authoritative definition, a force that 'plays only

14

an "infinitesimal" or "theoretical" part in bringing about injury' is not a substantial factor." (*Rutherford*, *supra*, 16 Cal.4th at p. 969.) Furthermore, while discussing the propriety of burden-shifting instructions on causation, the court suggested that the length, frequency, and intensity of an individual's exposure to an asbestos-containing product may be relevant to showing the causation of cancer.[7] UCC argues that those remarks oblige plaintiffs seeking to carry their burden of proof under *Rutherford* to "show, at a minimum, [that] exposure to the defendant's product was 'sufficiently lengthy, intense, and frequent' to warrant treating it as 'a substantial factor contributing to the risk of cancer.'"

UCC further contends the Marteneys' experts provided no testimony satisfying those requirements, arguing that the experts made only the "tautological claim that any asbestos exposure . . . 'contributes' to the risk." As noted above (see pt. B.2.iii, *ante*), Dr. Smith opined that when a person's exposure to asbestos causes mesothelioma, "every part of a causal dose that caused [the] cancer is important," and Dr. Dahlgren stated that there is "no threshold" below which exposures to asbestos have "no effect." UCC maintains that under their testimony, "any exposure to asbestos, however small, would always be sufficient to prove medical causation," and that nothing in their opinions "showed that the

---

[7]     In describing the scientific uncertainties attending the causation of cancer, the court asked rhetorically: "Taking into account the length, frequency, proximity and intensity of exposure, the peculiar properties of the individual product, any other potential causes to which the disease could be attributed (e.g., other asbestos products, cigarette smoking), and perhaps other factors affecting the assessment of comparative risk, should inhalation of fibers from the particular product be deemed a 'substantial factor' in causing the cancer?" (*Rutherford*, *supra*, 16 Cal.4th at p. 975.) Later, the court observed a burden-shifting instruction on causation might be appropriate in special circumstances, namely, "after the plaintiff had proven . . . [a] sufficiently lengthy, intense and frequent exposure as to render the defendant's product a substantial factor contributing to the risk of cancer." (*Id.* at p. 979.)

contribution of UCC's asbestos to . . . Marteney's risk of developing mesothelioma was more than 'negligible' or 'theoretical.'"

UCC's contention fails, as it relies on a defective rationale. Our inquiry concerns the existence of substantial evidence to support the judgment, not the Marteneys' burden of proof. The holding in *Rutherford* regarding the burden of proof does not dictate that in reviewing the denial of UCC's motion for judgment notwithstanding the verdict, we must focus *exclusively* on the testimony from the Marteneys' experts to determine whether the Marteneys demonstrated the second fact. Generally, the burden of proof is "the obligation of a party to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court." (Evid. Code, § 115.) However, although the burden of proof imposes an obligation on a specific party, that obligation "is 'satisfied when the requisite evidence has been introduced . . . , and . . . it is of no consequence whether the evidence was introduced by one party rather than the other[.]'" (*People v. Belton* (1979) 23 Cal.3d 516, 524; quoting Morgan, Basic Problems of State and Federal Evidence (Weinstein rev. ed. 1976) p. 14.) Accordingly, in examining the record for substantial evidence, we may look at the entire record to determine whether there was sufficient "'competent expert testimony'" regarding whether a particular exposure "was a substantial factor contributing to [Marteney's] risk of developing cancer." (*Rutherford*, *supra*, 16 Cal.4th at pp. 977, fn. 11, 982-983, italics deleted.)

The record, viewed as a whole, discloses adequate expert testimony regarding the length, intensity, and frequency of exposures to asbestos fibers from joint compounds containing UCC asbestos to support a finding that Marty Marteney's exposures were a substantial factor contributing to the risk of his cancer. Although the Marteneys' experts agreed that even small exposures to

16

asbestos are potentially material to the causation of mesothelioma, Dr. Dahlgren identified a specific level of exposure to asbestos -- namely, .05 fiber years -- associated with a "statistically significant[] increase[]" in lung cancer and mesothelioma. UCC's expert Dyson maintained that significant increments in risk arise only at higher exposure levels, but also testified regarding the exposures experienced by individuals working with joint compounds containing UCC asbestos. He stated that working with dry mix joint compounds involved four activities: mixing, applying the compound, sanding, and cleanup. The concentrations of airborne fibers per cubic centimeter from those activities were, respectively, 12.7, 0, 3.8, and 10.7. He further noted that although the "time-weighted average" of the concentrations arising from the activities -- as they would occur in the workplace -- is 2 fibers per cubic centimeter, the average concentration increases to 6 fibers per cubic centimeters if one focuses on the dust-producing activities.

Relying on those estimates, Dyson stated if a person worked with a joint compound containing UCC asbestos on 10 two-hour occasions, that person's level of exposure would be approximately .02 fiber years, based on the time-weighted average of 2 fibers per cubic centimeter for the four activities described above. He further testified that the exposure level of an observer watching the activities diminished as the observer's distance from them increased: at 4 feet, the observer's exposure was 50 percent of the worker's exposure, and at 10 feet, 10 percent of the worker's exposure.

Dyson's testimony supports reasonable inferences regarding the encounters with an asbestos-containing joint compound necessary for an exposure level of .05 fiber years, which Dr. Dahlgren described as presenting a statistically significant risk of cancer. Under Dyson's testimony, a person who worked with the joint

17

compound on 25 two-hour occasions -- that is, 50 hours -- would experience that level of exposure, based on the time-weighted average concentration of airborne fibers for all four activities (2 fibers per cubic centimeter). Furthermore, a person engaged *solely* in the dust-creating activities would experience that level of exposure in far less time, as the average concentration of airborne air fibers arising from those activities is three times greater than the time-weighted average for all four activities, and the average concentrations of air fibers arising from the dustiest activities -- mixing and cleanup -- are more than five times greater than that average.

Dyson's testimony thus supports the reasonable inference that a person engaged in the dust-producing activities -- and thereby creating the average concentration of airborne air fibers arising from those activities (6 fibers per cubic centimeter) -- would experience an exposure level of .05 fiber years in approximately 17 hours (one-third of 50 hours), based on the average concentration of airborne air fibers arising from those activities (6 fibers per cubic centimeter). His testimony also supports the reasonable inference that an observer standing within 10 feet of those activities would experience that exposure level in less than 170 hours. Moreover, even shorter periods would result in that exposure level if one focuses on the dustiest activities, namely, mixing and cleanup.

Viewed collectively, the expert testimony supports the reasonable inference that an exposure level of .05 fiber years would constitute "a substantial factor contributing to [a person's] risk of developing cancer" (*Rutherford*, *supra*, 16 Cal.4th at p. 982), as well as reasonable inferences regarding the length, frequency, and intensity of encounters with joint compounds necessary to create that level of exposure. Furthermore, the jury was free to make those inferences. In cases requiring expert testimony to establish the causation of a disease, the jury

18

may rejected even uncontradicted expert testimony, absent special circumstances not present here. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 632.) Furthermore, as a general rule, the jury may in suitable circumstances accept a portion of an expert's testimony while rejecting other aspects of it. (See *Liberty Mut. Ins. Co. v. Industrial Acc. Com.* (1948) 33 Cal.2d 89, 93-94; *San Gabriel Valley Water Co. City of Montebello* (1978) 84 Cal.App.3d 757, 765.) Thus, the jury could properly credit Dyson's testimony regarding the levels of asbestos exposure from activities involving joint compounds, while rejecting his view regarding the level at which such exposures presented a significant risk of cancer in favor of Dr. Dahlgren's. Accordingly, we reject UCC's contention there is insufficient expert testimony to satisfy *Rutherford*.[8]

### b. *Marteney's Exposure to UCC Asbestos*

UCC contends there is insufficient evidence regarding the extent to which Marty Marteney was exposed to UCC asbestos. As explained below, we disagree.

The record supports the reasonable inference that from 1969 to the mid-1970's, UCC supplied SG-210 to National Gypsum's Long Beach plant for use in its joint compounds, including Gold Bond. Indeed, as of March 1970, UCC's SG-210 was the sole asbestos incorporated into the Gold Bond joint compounds made in Long Beach. Generally, the joint compounds made at the Long Beach plant were distributed within California and other west coast states. In addition, there was evidence that Georgia Pacific arranged for Kelly-Moore to make joint compounds for it in California because shipping costs rendered the products that

---

[8]     As there is sufficient evidence to satisfy the requirements that UCC asserts are mandated in *Rutherford*, it is unnecessary for us to decide whether *Rutherford*, in fact, imposes those standards.

Georgia Pacific manufactured in other states uncompetitive in California. The jury thus reasonably could have inferred that the Gold Bond containing UCC asbestos made in Long Beach from 1969 to the mid-1970's was sold in Los Angeles, where Marteney lived. In addition, the jury heard evidence suggesting that during that period, some Georgia Pacific and Paco Quick Set containing UCC asbestos was made in California.

The record further establishes that from 1969 to 1975, Marteney encountered Gold Bond and the other joint compounds at work and at home. From 1969 to 1971 or 1972, he worked as a project architect for Levitt, and spent 20 percent of his time at work sites. According to Marteney, he was a "hands-on" employee at the job sites. He demonstrated how to mix joint compounds, participated in applying them, and was sometimes present during the clean up. He worked with Gold Bond, Georgia Pacific, and Paco Quick Set, and was around others who used them. The worksites themselves were dirty and dusty. After 1972, while working for Ficus, he was involved in a large hospital project, where workers used joint compounds, including Gold Bond and Georgia Pacific. In addition, from 1969 to the mid-1970's, Marteney also remodeled his home, and worked as a volunteer on a remodeling project involving a church. In working on his home, he used "big bags" of Gold Bond, as well as Paco Quick Set.

In our view, the evidence is sufficient to show that Marteney's contact with Gold Bond containing UCC asbestos created an exposure level of .05 fiber years.[9] As explained above (see pt. B.3.a), a person engaged in dust-producing activities with joint compounds -- such as mixing and cleaning -- would experience that

---

[9] For that reason, it is unnecessary to decide whether the evidence regarding Marteney's contact with the Georgia Pacific or Paco Quick Set joint compounds is also sufficient to support that conclusion.

20

exposure level in 17 hours or less, and a close observer of those activities would experience that exposure level in 170 hours or less. According to Marteney, while at Levitt, he spent 20 percent of his work week -- that is, approximately 400 hours per year, based on a 40-hour work week for 50 weeks -- at job sites, where he supervised workers using Gold Bond and participated in its use.[10] Furthermore, while at Ficus, he supervised workers using Gold Bond, and employed it in the remodeling of his home. In view of this evidence, the jury could reasonably infer that Marteney had encounters with Gold Bond sufficient for an exposure of .05 fiber years.[11] (See *Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962, 973-974 [under *Rutherford* standard, plaintiff adequately showed exposure to defendant's asbestos on basis of evidence that from mid- to late-1970's, while supervising workers, he frequently encountered dust from joint compound

---

[10] According to Dyson, for purposes of the "fiber year" unit of measurement, a year is 2000 hours, based on a 40-hour work week for 50 weeks.

[11] Pointing to certain apparent conflicts in Marteney's testimony, UCC maintains that it is insufficient to support the special verdicts. We disagree. As our Supreme Court explained, even internally inconsistent testimony from a single witness may support a judgment. "It is for the trier of fact to consider internal inconsistencies in testimony, to resolve them if this is possible, and to determine what weight should be given to such testimony." (*Clemmer, supra,* at p. 878.) Furthermore, "[t]he testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence, inconsistent or false as to other portions. [Citations.]" (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 366.) We reject the statements of a witness that the factfinder has believed only if they are "'inherently improbable,'" that is, "physically impossible or obviously false without resorting to inference or deduction." (*Watson v. Department of Rehabilitation* (1989) 212 Cal.App.3d 1271, 1293; see *Daly v. Wallace* (1965) 234 Cal.App.2d 689, 692.) Here, Marteney's testimony was neither physically impossible nor obviously false on its face.

UCC suggests that during the trial, the Marteneys assumed that Marty Marteney was exposed to joint compounds containing UCC asbestos only once or twice. That contention fails, as the record discloses only that their counsel asserted in closing arguments that one such exposure sufficed to establish causation.

incorporating defendant's asbestos].) In sum, there is sufficient evidence that UCC asbestos was a substantial factor in the causation of Marty Marteney's mesothelioma.**12**

4. *Sufficiency of the Evidence Regarding Elementis's Liability for the Marteneys' Injuries*

Elementis challenges the sufficiency of the evidence to support the special verdicts regarding its liability for the Marteneys' injuries arguing that "[a]bsolutely no evidence supports an inference that HCP distributed some SG-210 that became dust [Marty] Marteney inhaled." For the reasons discussed below, we reject Elementis's contention.

---

**12** For the first time on appeal, UCC's reply brief argues that under *Rutherford*, the record must contain sufficient evidence for the jury to estimate Marty Marteney's "overall exposure" to asbestos. As no such contention was raised in the opening brief, it has been forfeited. (*Horowitz v. Noble* (1978) 79 Cal.App.3d 120, 138-139; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 701, pp. 769-771.)

In a supplemental letter brief, UCC also directs our attention to *Shiffer v. CBS Corp.* (2015) 240 Cal.App.4th 246.) There, the plaintiff asserted products liability claims against a turbine manufacturer, alleging that his contact with asbestos-containing materials in a turbine made by the defendant caused his mesothelioma. (*Ibid.*) In opposing the defendant's motion for summary judgment on the claims, the plaintiff submitted declarations from three experts, who opined that the plaintiff's exposure to asbestos during the turbine's installation was significant, and constituted a substantial contributing factor to the plaintiff's aggregate dose of asbestos. (*Id.* at p. 250.) Affirming the grant of summary judgment, the appellate court concluded that the experts' opinions lacked a sufficient foundational basis, as the plaintiff had supplied the experts with *no* evidence that he had any exposure to asbestos. (*Id.* at p. 256.) Here, in contrast, the evidence regarding Marty Marteney's exposure to UCC asbestos and the testimony of appellants' and respondent's experts sufficed to show that UCC asbestos was a substantial factor in increasing his risk of mesothelioma.

### a. *Governing Principles*

At trial, the Marteneys maintained that Elementis was liable for their injuries because it was UCC's exclusive distributor of Calidria on the west coast during the pertinent period, and pursuant to an agreement, Elementis received a five or ten percent commission for a sale when UCC shipped the asbestos directly to the customer. As explained in *Bay Summit Community Assn. v. Shell Oil Co.* (1996) 51 Cal.App.4th 762, 773 (*Bay Summit*), the strict liability doctrine "extends to nonmanufacturing parties, outside the vertical chain of distribution of a product, which play an integral role in the 'producing and marketing enterprise' of a defective product and profit from placing the product into the stream of commerce." There, the plaintiffs asserted products liability claims against the manufacturers of a plastic plumbing system and a supplier of plastic resin, alleging that the fittings in the plumbing system were defective. (*Id*. at pp. 767-769.) At trial, the evidence showed that the supplier's resin was used in the system's plastic pipes, but the plaintiffs submitted no evidence that the resin was used in the defective fittings or that the resin itself was defective. (*Ibid*.) The plaintiffs' theory at trial was that the supplier was strictly liable for the defective plumbing system not as a resin supplier, but as a participant in the marketing and distribution of the system. (*Id*. at p. 771.)

In affirming the judgment in favor of the plaintiffs, the appellate court examined the principles under which entities may be subject to strict liability for playing a role in the marketing of a product. (*Bay Summit*, *supra*, 51 Cal.App.4th at p. 773.) Generally, the doctrine of strict liability is intended to ensure that parties that play an integral role in the manufacture, marketing, and distribution of a defective product bear the costs of injuries arising from the product. (*Id*. at pp. 772-773.) Thus, liability is properly imposed on nonmanufacturers of a

defective product involved in the "vertical distribution" of the product. (*Ibid.*) Furthermore, in suitable circumstances, liability may also be imposed on an entity that is neither the product's manufacturer nor within the product's "vertical chain of distribution . . . ." (*Id.* at pp. 773.) In such cases, "the mere fact that an entity 'promotes' or 'endorses' or 'advertises' a product does not automatically render that entity strictly liable for a defect in the product." (*Id.* at pp. 775-776.) Rather, "[t]he imposition of strict liability depends on whether the facts establish a sufficient causative relationship or connection between the defendant and the product so as to establish that the policies underlying the strict liability doctrine are satisfied." (*Id.* at p. 776.) Based on an examination of then-existing case authority, the court concluded that a defendant involved in the marketing/distribution process may be held strictly liable "if three factors are present: (1) the defendant received a direct financial benefit from its activities and from the sale of the product; (2) the defendant's role was integral to the business enterprise such that the defendant's conduct was a necessary factor in bringing the product to the initial consumer market; and (3) the defendant had control over, or a substantial ability to influence, the manufacturing or distribution process. (*Id.* at p. 776.)

Applying those principles to the case presented on appeal, the court determined that there was sufficient evidence to support the imposition of strict liability on the resin supplier. (*Bay Summit*, *supra*, 51 Cal.App.4th at p. 776.) Aside from supplying the resin for the pipes, the supplier had provided marketing assistance to pipe manufacturers, arranged for its employees to assist in the advertising and sales of pipes made with its resin, and directly promoted the plumbing system. (*Id.* at pp. 769-771.) The court thus concluded that the factors described above were present. (*Ibid.*)

24

b. *Evidence At Trial*

Regarding Elementis's role in the distribution of UCC asbestos, the Marteneys relied primarily on deposition testimony from Robert Mann, who had been designated to testify on behalf of Elementis. In the course of that deposition, Mann recounted deposition testimony from Leon Persson, who had previously been designated to testify on behalf of Elementis. Leon Persson was employed by HCP and its successors from 1958 to 1991. He was a branch manager in San Francisco, and became a regional vice president.

According to Mann's deposition testimony, in prior depositions, Persson provided the following account of HCP's relationship with UCC: HCP distributed UCC's Calidria from 1968 to 1986. It sold only UCC's Calidria, and it was the sole distributor of Calidria on the west coast. Persson was unable to recall, however, which grades of Calidria HCP distributed. Although Persson was personally responsible for overseeing HCP's distribution of Calidria, he worked closely with UCC in distributing that asbestos. In "nearly 100 percent" of customer contacts, he and a UCC representative made a joint visit. Although HCP delivered Calidria to customers, UCC also delivered Calidria directly to some customers. However, when a customer received Calidria directly from UCC, HCP received a commission or share of the profit pursuant to an exclusive distribution agreement that Persson had seen.[13]

In the deposition, Mann denied that HCP had an agreement with UCC of the type described by Persson. He had seen no such agreement, and none had been produced by Elementis. He acknowledged, however, that Steven Gripp, who had

---

[13] The Marteneys also presented evidence that UCC directly shipped large orders of asbestos to manufacturers on the west coast of the United States, and otherwise relied exclusively on HCP to ship smaller quantities of asbestos.

25

been designated to testify on Elementis's behalf on previous occasions, had stated in 1998 that the agreement existed. He further acknowledged that Elementis later "cull[ed]" its records, and following that event, Gripp stated that the agreement could not be located.

Mann also testified at trial on behalf of Elementis. He stated that during his career, he had encountered hundreds of distributor contracts, and never had seen one of the type described by Persson. He also stated HCP distributed UCC's SG-210 to joint compound manufacturers only from 1973 to 1977.

### c. *Analysis*

We conclude that the trial evidence, viewed in the light most favorable to the Marteneys, establishes that liability was properly imposed on Elementis. As explained above (see pt.B.3., *ante*), there was sufficient evidence that Marty Marteney's exposure to the Gold Bond made in Long Beach plan, which incorporated SG-210 from UCC, was a substantial factor in the causation of his mesothelioma. The evidence further shows that during Marteney's period of exposure to that joint compound, HCP was the exclusive distributor of UCC's Calidria on the west coast. Under the agreement between HCP and UCC, HCP received a commission for any Calidria that UCC supplied directly to a customer. The evidence further showed that HCP and UCC worked closely in distributing the asbestos, as their representatives met jointly with customers.

In our view, the record discloses evidence sufficient for the imposition of liability under the principles set forth in *Bay Summit*. That evidence unequivocally established that HCP was in the vertical chain of distribution regarding Calidria. Furthermore, to the extent that UCC, rather than HCP, directly shipped Calidria to customers, HCP is properly subject to liability for those

shipments, in view of the factors identified in *Bay Summit*.  Although HCP did not create the initial consumer market for asbestos-containing products, it derived profits from UCC's direct sales, worked jointly with UCC to sell Calidria, and had sufficient influence with UCC to negotiate an unusually favorable distribution agreement, namely, one containing the profit-sharing term noted above.

Elementis maintains there is insufficient evidence to support the imposition of liability, placing special emphasis on the lack of evidence that it shipped any UCC SG-210 to the Long Beach plant during Marteney's relevant period of exposure to Gold Bond, and the evidence questioning the existence of the distribution agreement.  In so arguing, however, Elementis "'misapprehends our role as an appellate court.  Review for substantial evidence is not trial de novo. [Citation.]'  [Citation.]  When there is substantial evidence to support the jury's actual conclusion, 'it is of no consequence that the [jury,] believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.'  [Citation.]"  (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1301.)  As explained above, there is sufficient evidence that the agreement in question existed.  In view of that agreement, Elementis was properly subject to liability for the distribution of  UCC's SG-210 to National Gypsum's Long Beach plant, which made the Gold Bond that Marty Marteney encountered.  In sum, the record discloses evidence adequate to support the imposition of strict liability on Elementis for the Marteneys' injuries.

C. *Warnings*

Appellants contend the jury's special verdicts regarding the Marteneys' warning-related theories of liability shield them from liability under the Marteneys' "defective design" theory of strict liability.  They argue that the latter

27

theory fails as a matter of law, in light of the jury's special verdicts rejecting the Marteneys' claims insofar as they were predicated on theories of negligence and "defective warning" strict liability. As explained below, we disagree.

### 1. *Marteneys' Claims and Jury's Special Verdicts*

The Marteneys submitted three theories of liability to the jury: strict liability predicated on a design defect; strict liability predicated on a failure to warn; and negligence predicated, inter alia, on a failure to warn. The "design defect" theory of strict liability relied on the so-called "consumer expectations" test for defects. Under that test, a product is defective in design if it "fail[s] to perform as safely as an ordinary consumer would expect." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 562 (*Soule*).) In connection with the theory, the jury was instructed that it could consider "the product as a whole, including its warnings."

The jury was instructed that the "defective warning" theory of strict liability required a determination that appellants had failed to provide adequate warnings of potential risk that were scientifically known or knowable when the product was distributed. In connection with such a theory, our Supreme Court has explained: "Generally speaking, manufacturers have a duty to warn consumers about the hazards inherent in their products. [Citation.] The requirement's purpose is to inform consumers about a product's hazards and faults of which they are unaware, so that they can refrain from using the product altogether or evade the danger by careful use." (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64.) A product that is otherwise flawless in its design and manufacture "'may nonetheless possess such risks to the user without a suitable warning that it becomes "defective" simply by the absence of a warning.'" (*Finn v. G. D. Searle & Co.* (1984) 35 Cal.3d 691, 699.)

The jury was instructed that the negligence theory relied in part on an allegation that appellants failed to exercise reasonable care in providing warnings. Under that theory, liability hinges on the reasonableness of the failure to warn, rather than on whether, in fact, the defendant failed to issue warnings regarding known or knowable hazards. (*Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1113 (*Carlin*).) "'Thus, the fact that a manufacturer acted as a reasonably prudent manufacturer in deciding not to warn, while perhaps absolving the manufacturer of liability under the negligence theory, will not preclude liability under strict liability principles if the trier of fact concludes that, based on the information scientifically available to the manufacturer, the manufacturer's failure to warn rendered the product unsafe to its users.'" (*Ibid.*, quoting *Anderson v. Owens-Corning Fiberglas Corp.* (1993) 53 Cal.3d 987, 1003.)

The jury returned special verdicts that appellants were not negligent, and that their product warnings adequately addressed the "potential risks that were known or knowable risks in light of the scientific and medical knowledge that was generally accepted in the scientific community at the time of sale or distribution." The jury nonetheless found that UCC asbestos was defective under the consumer expectations test.

### 2. *Analysis*

Appellants contend the special verdicts regarding the adequacy of the product warning mandated the contrary finding. As explained below, that contention fails, as the special verdicts regarding the "failure to warn" theories did not, as a matter of law, shield appellants from liability under a "defective design" theory relying on the consumer expectations test.

Under "defective warning" theories, defendants may avoid liability by showing that they acted reasonably in providing warnings (thus nullifying negligence), and that their warnings adequately addressed all known or knowable hazards (thus nullifying strict liability). Nonetheless, they may still be subject to liability under the "design defect" theory because their product "fail[s] to perform as safely as an ordinary consumer would expect." (*Soule, supra*, 8 Cal.4th at p. 562.) (See *Carlin*, *supra*, 13 Cal.4th at p. 1117 ["[U]nlike strict liability for design defects, strict liability for failure to warn does not potentially subject drug manufacturers to liability for flaws in their products that they have not, and could not have, discovered. Drug manufacturers need only warn of risks that are *actually known or reasonably scientifically knowable.*"]; *Boeken v. Phillip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1669 ["Product liability under a failure-to-warn theory is a distinct cause of action from one under the consumer expectations test."].)

Nor did the trial evidence mandate that UCC's asbestos was nondefective under the consumer expectations test. As explained in *Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1185 (*Arena*), that test "applies in 'cases in which the everyday experience of the product's users permits a conclusion that the product's design violated minimum safety assumptions, and is thus defective regardless of expert opinion about the merits of the design.' [Citation.] A plaintiff may show the objective condition of the product, and the fact finder may use its own "'sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence.'" [Citation.]"

In *Arena*, the plaintiff asserted an "defective design" products liability claim against a supplier of raw asbestos and a manufacturer of asbestos-containing

30

products, alleging that exposure to asbestos fibers from the products containing the supplier's asbestos caused his cancer. (*Arena*, *supra*, 63 Cal.App.4th at p. 1183.) Although the appellate court reversed a judgment in favor of the plaintiff for a redetermination of damages, it concluded that the consumer expectations test was properly applied to establish a "design defect" theory of strict liability against the supplier. (*Id*. at pp. 1186-1190.) The court stated: "To the extent that the term 'design' merely means a preconceived plan, even raw asbestos has a design, in that the miner's subjective plan of blasting it out of the ground, pounding and separating the fibers, and marketing them for various uses, constitutes a design. . . .[] [W]hen that design violates minimum safety assumptions, it is defective. [Citation.]" (*Id*. at pp. 1185-1186-1188, fn. omitted.) The court further noted certain principles restricting the imposition of liability on suppliers of component parts and raw materials to manufacturers whose products cause injury -- including the so-called "component parts" doctrine, which we discuss below -- but determined that they were inapplicable, because the plaintiff's injuries arose from dust containing asbestos fibers which had not been altered in the manufacturing process. (*Id*. at pp. 1186-1191.)

Although *Arena* did not address a "defective warning" claim, it establishes the propriety of applying the consumer expectations test to the Marteneys' "defect design" claims. Under that test, we examine the ordinary expectations of consumers regarding the safety of joint compounds during the pertinent period of Marty Marteney's exposure to those asbestos-containing products. At trial, the evidence showed that as of 1968, appellants provided information describing the risks of asbestos to joint compound manufacturers, but there was no evidence that

those warnings were passed onto to users such as Marteney.**14** The evidence otherwise shows only that Marteney and the workers he oversaw at jobsites used asbestos-containing joint compounds with no awareness of their hazards or the need for precautions. In addition, John Walsh, who testified on behalf of UCC, acknowledged that as late as 1978, "do-it-yourselfers" generally lacked knowledge regarding the hazards of asbestos in joint compounds.

Relying on *Groll v. Shell Oil Co.* (1983) 148 Cal.App.3d 444 (*Groll*) and *Walker v. Stauffer Chemical Corp.* (1971) 19 Cal.App.3d 669 (*Walker*), appellants contend the consumer expectations test is inapplicable to UCC's asbestos in view of UCC's warnings to appellants' customers. In *Groll*, a fuel manufacturer sold lantern fuel in bulk to a distributor, and provided the distributor warnings regarding the fuel's hazards. (*Groll*, *supra*, 148 Cal.App.3d at pp. 446-447.) In turn, the distributor repackaged the fuel and marketed it to the public with similar warnings. (*Ibid.*) The plaintiff asserted products liability claims against the fuel manufacturer and the distributor predicated on negligence and a failure to warn, alleging that he suffered injuries from an explosion when he used the fuel to light

---

**14** The trial evidence showed that in 1964, UCC prepared an internal asbestos toxicology report reflecting that exposure to asbestos had been associated with cancer, including some cancerous lung tumors. In 1968, UCC created a brochure to inform joint compound manufacturers regarding asbestos-related hazards, attached a warning label to its products stating that "'[b]reathing dust may be harmful,'" and provided a test report linking asbestos to mesothelioma. In 1972, after the federal Occupational Health and Safety Administration (OSHA) imposed asbestos regulations in 1972, UCC forwarded them to its customers; in addition, UCC described asbestos-related hazards -- including the risk of mesothelioma -- in material safety data sheets accompanying its asbestos, and gave other information regarding those hazards to its customers. The trial evidence further showed that Elementis, as UCC's distributor, "passed on" any information that UCC provided. However, as of 1984, the bags in which UCC shipped Calidria did not carry a warning identifying mesothelioma as an asbestos-related hazard.

his fireplace. (*Ibid*.) The appellate court affirmed a grant of nonsuit on the plaintiff's "defective warning" claims against the fuel manufacturer, stating that "[s]ince [it] manufactured and sold [the fuel] in bulk, its responsibility must be absolved at such time as it provides adequate warnings to the distributor who subsequently packages, labels and markets the product." (*Id*. at p. 449-450.)

*Groll* is distinguishable, as it confronted only "defective warning" claims, and examined the propriety of imposing liability on a supplier that provided its product with adequate warnings to an intermediary, which passed those warnings along to the product's end user. As explained above, under the consumer expectations test, the key inquiry focuses on the expectations of the ultimate consumer. The evidence in the record supports the reasonable inference that appellants' warnings had no effect on average joint compound consumers.[15]

*Walker* is also distinguishable, as it represents an application of the so-called "component parts" doctrine. Under that doctrine, suppliers of component parts or raw materials integrated into an "end product" are ordinarily not liable for defects in the end product, provided that their own parts or material were nondefective, and they did not exercise control over the end product. (*Artiglio v. General Electric. Co.* (1998) 61 Cal.App.4th 830, 838-840.) In *Walker*, the appellate court concluded only that a supplier of acid was not liable for injuries from drain cleanser containing acid as component, as the acid was substantially

---

[15]    Regarding the potential relevance of *Groll*, appellants purport to find support from *Garza v. Asbestos Corp., Ltd.* (2008) 161 Cal.App.4th 651, 658-662, in which the appellate court agreed with *Arena* regarding the application of the consumer expectations test to "defective design" claims against suppliers of raw asbestos. In so concluding, the court distinguished *Groll* on the grounds that in the case before it, the supplier of raw asbestos gave no warnings to its customers. (*Id*. at pp. 661-662.) *Garza* thus provides no guidance on the issue before us.

changed during the process of making the cleanser, over which the supplier had no control. (*Id*. at p. 672.) That rationale is inapplicable here for the reasons discussed in *Arena*, namely, Marty Marteney's injuries arose from asbestos fibers not materially altered by the manufacturing process. In sum, the jury's special verdicts regarding the adequacy of appellants' warnings did not shield them from liability under a "defective design" theory of strict liability.[16]

D. *Liability of Suppliers of Raw Materials*

Appellants contend they are not subject to strict liability under a "design defect" theory, arguing that in *O'Neil, supra,* 53 Cal.4th 335, our Supreme Court adopted section 5 of the Restatement Third of Torts, including the doctrine set forth in comment c. That comment addresses sand, gravel, and other materials when they take the form of "basic raw material[s]," and sets forth limitations on their suppliers' liability for design and warning defects when they are integrated into end products. The comment further states that such basic raw materials "cannot" suffer from design defects. (Rest.3d Torts, Products Liability, § 5, com.

---

[16] The remaining decisions upon which appellants rely are inapposite, as they merely establish that the existence of direct warnings to the end user of a product may preclude the imposition of strict liability on a manufacturer (*Oakes v. E. I. Du Pont Nemours & Co., Inc.* (1969) 272 Cal.App.2d 645, 649), and are relevant to the expectations of end users, for purposes of the consumer expectations test (*Dinsio v. Occidental Chem. Corp.* (1998) 126 Ohio App.3d 292, 295-298 [710 N.E.2d 326, 329]; *McCathern v. Toyota Motor Corp.* (1999) 160 Ore.App. 201, 228 [985 P.2d 804, 820]; *Tillman v. R.J. Reynolds Co.* Tobacco (Ala. 2003) 871 So.2d 28, 34; *Adkins v. GAF Corp.* (6th Cir. 1991) 923 F.2d 1225, 1228; *Graves v. Church & Dwight Co.* Inc. (1993) 267 N.J.Super. 445, 467-468 [631 A.2d 1248, 1259-1260].) Here, there is no evidence that warnings accompanied the joint compounds that Marty Marteney encountered.

c., p. 134.)[17] Appellants argue that *O'Neil* must be regarded as having adopted comment (c), and that its doctrine necessarily safeguards them from "design defect" liability. We disagree.

*O'Neil* cannot reasonably be regarded as having adopted the doctrine in comment (c). There the family of a deceased U.S. Navy seaman asserted claims for negligence and strict liability against manufacturers of pumps and valves used on warships, alleging that the serviceman's exposure to asbestos dust from asbestos-containing materials used in connection with the pumps and valves caused his fatal mesothelioma. (*O'Neil*, *supra*, 53 Cal.4th at pp. 342-347.) The court rejected the claims, concluding that "a product manufacturer may not be held liable in strict liability or negligence for harm caused by another manufacturer's product unless the defendant's own product contributed substantially to the harm, or the defendant participated substantially in creating a harmful combined use of the products." (*Id.* at p. 342.)

In so concluding, the court discussed the component parts doctrine, which it characterized as shielding a component part manufacturer from liability for

---

**17**      Comment c states: "Product components include raw materials. . . . Regarding the seller's exposure to liability for defective design, a basic raw material such as sand, gravel, or kerosene cannot be defectively designed. Inappropriate decisions regarding the use of such materials are not attributable to the supplier of the raw materials but rather to the fabricator that puts them to improper use. The manufacturer of the integrated product has a significant comparative advantage regarding selection of materials to be used. Accordingly, raw-materials sellers are not subject to liability for harm caused by defective design of the end-product. The same considerations apply to failure-to-warn claims against sellers of raw materials. To impose a duty to warn would require the seller to develop expertise regarding a multitude of different end-products and to investigate the actual use of raw materials by manufacturers over whom the supplier has no control. Courts uniformly refuse to impose such an onerous duty to warn." (Rest.3d, Torts, Products Liability, § 5, com. c., p. 134.)

35

injuries arising from a finished product that integrated the component "unless the component itself was defective and caused harm." (*O'Neil*, *supra*, 53 Cal.4th at p. 355.) As support for that exception, the court pointed to subdivision (a) of section 5 of the Restatement Third of Torts, which states: "One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if: [¶] (a) the component is defective in itself, . . . and the defect causes the harm . . . ." (*O'Neil, supra,* at p. 355.) *O'Neil* otherwise contains *no* reference to comment (c), and does not discuss the doctrine stated in it.

Nothing in *O'Neil* supports the reasonable inference that the court adopted the entirety of section 5 of the Restatement Third of Torts, including the doctrine stated in comment (c). The court's acceptance of a portion of that section did not, by itself carry a commitment to the entire section. (See *Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 130-135 [rejecting portion of section 402A of the Restatement Second of Torts while approving other portions of that section].) Furthermore, as the court did not discuss the doctrine set forth in comment (c), it cannot be viewed as having accepted it. (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524 ("Language used in any opinion is . . . to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered.")].)

Furthermore, we conclude that the doctrine in comment (c) is inapplicable to appellants. As explained in *Arena*, the doctrine does not encompass raw asbestos: "'[A]sbestos is not a component material that is usually innocuous, such as sand, gravel, nuts or screws. . . . [I]t is the asbestos itself that produces the harmful dust.'" (*Arena*, *supra*, 63 Cal.App.4th at p. 1191.) Accordingly,

appellants are properly subject to liability under a "defective design" theory of strict liability.

/ / /

/ / /

/ / /

## DISPOSITION

The judgment is affirmed.  Respondent is awarded her costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


EPSTEIN, P. J.


COLLINS, J.